193 P.3d 1108 (2008)
STATE of Washington, Respondent,
v.
Stanley Scott SADLER, Appellant.
No. 35021-1-II.
Court of Appeals of Washington, Division 2.
October 14, 2008.
*1113 Rita Joan Griffith, Attorney at Law, Seattle, WA, for Appellant.
Michelle Hyer, Pierce County Prosecutor, Tacoma, WA, for Respondent.
ARMSTRONG, J.
¶ 1 Stanley Scott Sadler appeals his convictions of eight counts of sexual exploitation of a minor. Through counsel, he argues that the trial court erred when it: (1) heard his Batson[1] challenge in the jury room rather than the open courtroom, thereby violating his right to an open public trial; (2) denied his CrR 3.6 motion to suppress the evidence discovered in his residence; and (3) admitted his statements to law enforcement. In a pro se statement of additional grounds for review (SAG),[2] Sadler also argues that the statutory defense to the sexual exploitation of a minor charges, RCW 9.68A.110(3), is unconstitutionally vague as applied.[3]
¶ 2 We hold that the trial court violated Sadler's constitutional right to an open public trial when it held the Batson hearing in the jury room. We further hold that (1) the trial court erred when it concluded that a second warrantless entry into Sadler's residence by law enforcement for the sole purpose of obtaining information to support a search warrant application was lawful, (2) the trial court properly admitted Sadler's statements to law enforcement, and (3) Sadler's vagueness argument is without merit. Accordingly, we reverse the convictions and remand for a hearing on the validity of the search warrant under the independent source doctrine and, if the search warrant is valid and the State chooses to retry Sadler, for a new trial.

FACTS
¶ 3 On August 29, 2004, 14-year-old K.T. ran away from her Clark County, Washington foster home and was reported missing. Following a tip from a private organization that had tracked K.T.'s recent Internet activity, officers eventually located K.T. at Sadler's residence.
¶ 4 The subsequent searches of Sadler's residence and computer equipment yielded a significant amount of evidence,[4] including numerous *1114 images of K.T. engaging in sexually explicit activities. Based on this evidence, the State charged Sadler by second amended information with 38 felony offenses, including 8 counts of sexual exploitation of a minor.[5]
¶ 5 During jury selection, the parties conducted an extensive voir dire of the 71-member jury panel. Following voir dire, the State exercised two of its peremptory challenges to dismiss juror 2 and juror 27, the only two African-American jurors on the panel. At the close of voir dire, defense counsel raised a Batson challenge to the State's exercise of peremptory challenges against jurors 2 and 27, asserting that the State was unlawfully excluding these jurors because of their race.
¶ 6 Without discussing its reasons for doing so on the record or asking Sadler or anyone else present to comment, the trial court heard Sadler's Batson challenge in the jury room. Before moving the hearing, the trial judge stated, "We are going to step into the jury room for one matter on the record. Just don't leave the courtroom" Report of Proceedings (RP) at 855. The record does not reflect whether members of the public were present in the courtroom at the time or whether the trial court intended to allow spectators into the jury room. Sadler, defense counsel, the deputy prosecutor, corrections officers, and the court reporter were present at the hearing.
¶ 7 During the Batson hearing, the State posited several justifications for striking each of the two African-American jurors. Defense counsel argued that these reasons were pretextual, but the trial court found that the State had carried its burden of showing that the peremptory strikes were not racially motivated.
¶ 8 At trial,[6] Sadler admitted that he met K.T. online through a bondage, discipline, and sadomasochistic (BDSM) oriented web site and, at her request, took her to his home after picking her up in Camas, Washington; that he had repeated sexual contact with K.T.; that he photographed K.T. engaging in a variety of sexually explicit conduct; and that he distributed some of these photographs to others. But he asserted that K.T consented to the activities; that K.T. had represented to him that she was 19 and he reasonably believed her; that K.T. showed him a Michigan birth certificate and a Washington identification card or driver's license via webcam, which showed she was 19; and that others appeared to believe K.T. was over 18.
¶ 9 Sadler's assertion that K.T. had shown him identification proving she was over 18 went to the statutory defense for the sexual exploitation of a minor charges, RCW 9.68A.110(3). That statute required Sadler to prove that he
made a reasonable bona fide attempt to ascertain the true age of the minor[[7]] by requiring production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper and did not rely solely on the oral allegations or apparent age of the minor.
The State attempted to show that Sadler's claim that K.T. showed him identification via webcam was not credible and that even if K.T. had shown him such identification, it was not a reasonable bona fide attempt to establish her age.
¶ 10 The jury convicted Sadler on eight counts of sexual exploitation of a minor and acquitted him of the remaining thirty counts.

ANALYSIS

I. OPEN PUBLIC TRIAL
¶ 11 Sadler first argues that the trial court denied him his constitutional right to an open *1115 public trial when it heard his Batson challenge in the jury room rather than in the open courtroom. We agree.

A. Right to Open Public Trial

¶ 12 "Article I, section 22 of the Washington Constitution[[8]] and the sixth amendment to the United States Constitution[[9]] both guarantee criminal defendants the right to a public trial."[10]State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005). The right to an open public trial ensures that the defendant receives a fair trial, in part by reminding the officers of the court of the importance of their functions, encouraging witnesses to come forward, and discouraging perjury. Waller v. Georgia, 467 U.S. 39, 46-47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); see Brightman, 155 Wash.2d at 514, 122 P.3d 150. Although the right to a public trial can serve the public or the defendant, the public's right and the defendant's right "serve complementary and interdependent functions in assuring the fairness of our judicial system. In particular, the public trial right operates as an essential cog in the constitutional design of fair trial safeguards."[11]State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995).
¶ 13 Additionally, "it is well settled that the right to a public trial also extends to jury selection." Brightman, 155 Wash.2d at 515, 122 P.3d 150 (citing In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004) (citing Press-Enter. Co. v. Superior Court of Calif., Riverside County, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984))). "[A] closed jury selection process harms the defendant by preventing his or her family from contributing their knowledge or insight to jury selection and by preventing the venire from seeing the interested individuals." Brightman, 155 Wash.2d at 515, 122 P.3d 150 (emphasis added) (citing Orange, 152 Wash.2d at 812, 100 P.3d 291). In addition, "[t]he guaranty of open criminal proceedings extends to `[t]he process of juror selection'" because the jury selection process "`is itself a matter of importance, not simply to the adversaries but to the criminal justice system.'" Orange, 152 Wash.2d at 804, 100 P.3d 291 (emphasis added) (quoting Press-Enter. Co., 464 U.S. at 505, 104 S.Ct. 819 (second alteration in original)).
¶ 14 Generally, to protect these important rights, before a trial court may exclude the public from the courtroom, it must conduct a five-part Bone-Club inquiry[12] and determine if the closure will unjustifiably *1116 interfere with the defendant's right to a public trial. Brightman, 155 Wash.2d at 515, 122 P.3d 150. If the proceeding is subject to the right to a public trial, a trial court's failure to conduct a Bone-Club inquiry before excluding the public "results in a violation of the defendant's public trial rights." Brightman, 155 Wash.2d at 515-16, 122 P.3d 150 (citing Orange, 152 Wash.2d at 809, 100 P.3d 291). The defendant need show no prejudice resulting from a violation of this right; prejudice is presumed. Bone-Club, 128 Wash.2d at 261-62, 906 P.2d 325 (citing State v. Marsh, 126 Wash. 142, 147, 217 P. 705 (1923)); State v. Rivera, 108 Wash.App. 645, 652, 32 P.3d 292 (2001). Furthermore, a defendant's failure to "lodge a contemporaneous objection" at the time of the closure does not amount to a waiver of his right to a public trial.[13]Brightman, 155 Wash.2d at 517, 122 P.3d 150 (citing Bone-Club, 128 Wash.2d at 257, 906 P.2d 325). The remedy for a violation of article I, section 22 is remand for a new trial. Rivera, 108 Wash.App. at 652, 32 P.3d 292 (citing Bone-Club, 128 Wash.2d at 261-62, 906 P.2d 325). Because the issue of whether a defendant's right to a public trial has been violated is a question of law, we review it de novo. Brightman, 155 Wash.2d at 514, 122 P.3d 150.

B. Closure Excluding the Public

¶ 15 To determine whether the trial court violated Sadler's right to a public trial, we must first decide whether the trial court's action here amounted to a closure excluding the public. We conclude that it did.
¶ 16 Without citation to authority, the State argues that the proceeding was not closed to the public because the trial court never asked anyone in the courtroom to leave the courtroom; nothing in the record shows that the trial court affirmatively excluded the public from the Batson hearing; and because counsel, the trial court, the defendant, two correctional officers, and the court reporter were present at the hearing. Sadler responds, also without citation to authority, that the proceeding was closed to the public because the trial court moved it into the jury room and did not invite the public to attend the hearing. We agree with Sadler.
¶ 17 To determine whether the trial court excluded the public from the Batson hearing, we look at the nature of the closure. See Orange, 152 Wash.2d at 807-08, 100 P.3d 291. Admittedly, unlike the situations in Orange, 152 Wash.2d at 808, 100 P.3d 291, and Brightman, 155 Wash.2d at 511, 122 P.3d 150, the trial court did not expressly exclude the public during the jury selection process. But this case is also not similar to those instances that did not amount to a closure where the trial court limited access to the proceedings by imposing security measures or where the courtroom was simply not large enough to accommodate all potential spectators. See, e.g., United States v. Shryock, 342 F.3d 948, 974 (9th Cir.2003) (no Sixth Amendment violation when seating limited by size of courtroom). Here, the trial court's affirmative act of moving the proceeding into the jury room, a part of the court not ordinarily accessible to the public, without inviting the public to attend, had the same effect as expressly excluding the public. Jury rooms are not ordinarily accessible to the public; in fact, it is well known that juries are often taken into the jury room to be *1117 insulated from events occurring in the courtroom. Nor does the mere presence of the parties, security, and the court reporter demonstrate that the public was entitled to attend this hearing. Without an explicit invitation by the trial judge, no member of the public would have understood that the jury room was serving as a courtroom for the purposes of the Batson hearing. And in this case, the trial court told everyone sitting in the courtroom, "Just don't leave the courtroom." RP at 855. Under these circumstances the trial court's removal of the proceedings to a non-courtroom was equivalent to closing the courtroom to the public.
¶ 18 The dissent relies on State v. Momah, 141 Wash.App. 705, 171 P.3d 1064 (2007), review granted, 163 Wash.2d 1012, 180 P.3d 1291 (2008),[14] in which Division One takes a very different approach to what constitutes a violation of the right to a public trial. Dissent at 1130-31. In that case, the trial court conducted individual questioning of certain jurors in chambers or in the jury room with the defendant, counsel, and a court reporter present. Momah, 141 Wash.App. at 710-11, 171 P.3d 1064. The court held that a defendant's right to a public trial is not triggered until the trial court explicitly orders the courtroom closed, citing Brightman's rule that "`once the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed.'" Momah, 141 Wash.App. at 714, 171 P.3d 1064 (emphasis omitted) (alteration omitted) (quoting Brightman, 155 Wash.2d at 516, 122 P.3d 150). But Division One's analysis seems to foreclose any possibility that a defendant could prove that a courtroom was closed by other than an explicit ruling by the trial court. We have joined Division Three in strongly disagreeing with this approach. State v. Erickson, ___ Wash.App. ___, 189 P.3d 245, 249-50 (2008); see State v. Duckett, 141 Wash.App. 797, 809, 173 P.3d 948 (2007); State v. Frawley, 140 Wash.App. 713, 720, 167 P.3d 593 (2007). Despite the absence of any explicit exclusion of the public, Sadler has met his burden to show that moving his Batson hearing into the jury room constituted a courtroom closure.

C. Right to Public Trial in Batson Hearing Context

¶ 19 Next, we must determine whether the right to a public trial extends to Batson hearings. Citing In re Personal Restraint of Lord, 123 Wash.2d 296, 306, 868 P.2d 835 (1994), In re Personal Restraint of Pirtle, 136 Wash.2d 467, 484, 965 P.2d 593 (1998), and Tolbert v. Page, 182 F.3d 677, 680 (9th Cir.1999), the State contends that even if holding the Batson hearing in the jury room excluded the public, Sadler had no right to a public hearing because the Batson hearing was equivalent to an in-chambers or bench conference on a purely legal matter to which Sadler himself, let alone the public, had no right to attend. We disagree.
¶ 20 "The public trial right applies to the evidentiary phases of the trial, and to other `adversary proceedings.'" Rivera, 108 Wash.App. at 652-53, 32 P.3d 292 (emphasis added) (quoting Ayala v. Speckard, 131 F.3d 62, 69 (2d Cir.1997)). The right to public trial is linked to the defendant's constitutional right to be present during the critical phases of trial; thus, "a defendant has a right to an open court whenever evidence is taken, during a suppression hearing, ... during voir dire," and during the jury selection process. Rivera, 108 Wash.App. at 653, 32 P.3d 292 (citing Press-Enter. Co., 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629). A defendant does not, however, have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of disputed facts. See Rivera, 108 Wash.App. at 653, 32 P.3d 292 (neither public nor defendant had a right to be present when trial court addressed a juror's complaint about another juror's hygiene); see also State v. Bremer, 98 Wash.App. 832, 835, 991 P.2d 118 (2000).
¶ 21 When, a party raises a Batson challenge, the trial court applies a three-part test to determine if the peremptory challenge *1118 is race-based: (1) the trial court must determine initially whether the party raising the Batson challenge "`has made out a prima facie case of racial discrimination'"; (2) if it determines there is a prima facie case of racial discrimination, "`the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation'"; and (3) if the proponent of the strike tenders a race-neutral explanation, "`the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.'" State v. Vreen, 143 Wash.2d 923, 926-27, 26 P.3d 236 (2001) (quoting Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).
¶ 22 Although not a "factual question" on the merits of the underlying case, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." Hernandez v. New York, 500 U.S. 352, 364, 372, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion but with six justices agreeing on this rule) (citing Batson, 476 U.S. at 98 n. 21, 106 S.Ct. 1712); State v. Rhodes, 82 Wash.App. 192, 197, 917 P.2d 149 (1996) (quotations omitted); see also Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 1207-08, 170 L.Ed.2d 175 (2008). Indeed, the United States Supreme Court has characterized the "intent to discriminate" determination as a "pure issue of fact" because the underlying question is whether counsel's race-neutral explanation for striking a juror should be believed. Hernandez, 500 U.S. at 364-65, 111 S.Ct. 1859; Rhodes, 82 Wash.App. at 196, 917 P.2d 149. Even though the trial court is not taking sworn testimony from witnesses, the attorney's explanation itself constitutes new facts not previously before' the public, and the court's decision involves an evaluation not only of whether the attorney's explanation is consistent with what the trial court observed during voir dire, but also of the challenging attorney's credibility.[15]See Snyder, 128 S.Ct. at 1208; State v. Hicks, 163 Wash.2d 477, 493, 181 P.3d 831 (2008) (quoting Batson, 476 U.S. at 98 n. 21, 106 S.Ct. 1712). As the Court recently reiterated, "`the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'" Snyder, 128 S.Ct. at 1208 (alteration in original) (quoting Hernandez, 500 U.S. at 365, 111 S.Ct. 1859). The dissent's argument that the trial court did not rely on "evidence not previously taken in the courtroom" is not persuasive. Dissent at 1129-30. And it is axiomatic that assessment of demeanor and credibility is "`peculiarly within a trial judge's province'" as a finder of fact.[16]Snyder, 128 S.Ct. at 1208 (quoting Hernandez, 500 U.S. at 365, 111 S.Ct. 1859 (quoting Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985))); Hicks, 163 Wash.2d at 493, 181 P.3d 831 (quotation omitted); Rhodes, 82 Wash.App. at 196-97, 917 P.2d 149 (quotations omitted).
¶ 23 Additionally, the purposes underlying a public trial include ensuring that the public can see that the accused is dealt with fairly, Waller, 467 U.S. at 46, 104 S.Ct. 2210, and reminding officers of the court of their responsibilities to assure that the defendant receives a fair trial. Few aspects of a trial can be more important to these goals than whether the prosecutor has excused jurors because of their race, an issue in which the public has a vital interest. And the court cannot serve this vital interest by hearing and evaluating the prosecutor's justification for excusing the jurors behind closed doors. Rather, the prosecutor's explanation must be tested in a forum open to the public.
¶ 24 Furthermore, although the State's cited cases establish that defendants are not *1119 entitled to attend in-chambers or bench conferences addressing purely legal or ministerial matters, these cases do not show that a Batson challenge falls under either category. Both Lord and Pirtle addressed whether the defendant had a right to be present when the trial court was addressing purely ministerial or legal matters. In Lord, the matters included: (1) a deferred ruling on an ER 609 motion, (2) a defense motion for funds to get Lord's hair cut and to provide him with clothing for trial, (3) questions regarding the wording of the jury questionnaires and pretrial instructions, (4) a time limit for testing certain evidence, (5) the trial court's announcement of its rulings on previously argued evidentiary matters, (6) a decision allowing the jurors to take notes during trial, and (7) an order directing the State to provide the defense with summaries of its witnesses' testimony. Lord, 123 Wash.2d at 306, 868 P.2d 835. In Pirtle, the matters included: (1) the wording of jury instructions; (2) ministerial matters; and (3) whether the jury should be sequestered. Pirtle, 136 Wash.2d at 484, 965 P.2d 593. Thus, in Lord and Pirtle, the matters were more clearly ministerial or purely legal issues. Here, in contrast, the Batson challenge was an integral part of the jury selection process requiring the trial court to make credibility determinations based, at least in part, on "`the demeanor of the attorney ... exercis[ing] the challenge'" when evaluating the State's purported reasons for excluding the only two African-American jurors on the panel, rather than a purely ministerial matter. Snyder, 128 S.Ct. at 1208 (quoting Hernandez, 500 U.S. at 365, 111 S.Ct. 1859).
¶ 25 Tolbert is likewise inapposite. In Tolbert, the issue was whether the trial court properly denied a defendant's Batson challenge. Tolbert, 182 F.3d at 679. It did not address whether a Batson challenge is subject to the right of an open public trial. The Tolbert court did say that portions of a Batson analysis, specifically whether the raceneutral justification is an adequate race-neutral explanation or whether the challenged juror is a member of a protected class for Batson purposes, involve purely legal issues. But it did not say that a Batson analysis, as a whole, is a purely legal issue. In fact, the Tolbert court explained that "[w]hether the defendant has satisfied the ultimate burden of proving purposeful discrimination is, of course, a question of fact reviewed for clear error." Tolbert, 182 F.3d at 680 n. 5 (emphasis added) (citations omitted). And, as we have already noted, the United State Supreme Court recently reiterated that the trial court is making factual determinations, including evaluation of the credibility of the party accused of dismissing jurors for racially motivated reasons, that are clearly not purely legal matters. Snyder, 128 S.Ct. at 1207-08. Here, the trial court addressed the Batson challenge in its entirely, not just the legal aspects of that analysis, outside the presence of the jury.

D. Conclusion

¶ 26 Because a Batson hearing involves factual and credibility determinations and is relevant to the fairness and integrity of the judicial process as a whole, we conclude that the right to public trial exists in this context. Here, nothing in the record suggests that the trial court recognized, let alone considered, Sadler's right to a public trial before removing the hearing to the jury room. And although Sadler has not shown prejudice, his right to public trial is structural error that is "per se" reversible error. Thus, we reverse Sadler's convictions and remand for further proceedings.[17]

II. DENIAL OF CRR 3.6 MOTION
¶ 27 Sadler next contends that the trial court erred when it denied his CrR 3.6 motion to suppress the evidence found during the search of his residence.[18] We hold that *1120 the trial court did not err when it concluded that the initial warrantless entry into Sadler's residence was lawful. But we further hold that the trial court erred when it found that a second warrantless entry into the residence for the purpose of gathering information for the search warrant was lawful and when it failed to consider whether the search warrant was valid without the information obtained during the second warrantless entry.

A. Related Facts

¶ 28 On September 12, 2004, a private organization contacted the Clark County Sheriff's Office and reported that it had tracked some of K.T.'s recent Internet activity to an internet provider (IP) address. After an investigator tracked the IP address to Sadler and obtained his physical address in University Place, Washington, the Clark County Sheriff's Office sent a teletype to the Pierce County Sheriff's Office requesting that it attempt to contact K.T. at Sadler's address. In this request, the Clark County Sheriff's Office stated that K.T. had disappeared from a foster home two weeks earlier, that she might have met someone on the Internet, that she was possibly attempting to pass as a 19-year-old, and that she might be involved in sadomasochistic sexual activity.
¶ 29 Fircrest Police Officer Eric Norling and Deputy Christopher Rather were provided with this information and dispatched to Sadler's house. When they arrived, Officer Norling knocked loudly on the front door and rang the doorbell several times while Deputy Rather watched the back of the residence. Eventually, a man who appeared to be in his 40s opened the door. Officer Norling observed that the man was sweating profusely and that he "looked surprised." Report of Proceedings (RP) (3.5/3.6 Hearing) at 15.
¶ 30 After verifying that the man was Sadler, Officer Norling asked him if K.T. was there; Sadler responded that she was asleep. Sadler then turned and started up the stairs while calling K.T.'s name. Officer Norling followed Sadler to an upstairs bedroom. Deputy Rather, who had followed Officer Norling inside, remained downstairs and began to look for other people to ensure officer safety.
¶ 31 Once upstairs, Officer Norling saw K.T. laying on a' bed in the fetal position. K.T.'s skirt was pulled up to just below her waist. She did not have on any underwear and her buttocks were exposed. Officer Norling also observed chains on the bed frame, leather cuffs on the nightstand, and a vibrator nearby. K.T. appeared to be sleeping or unconscious, and she was slow to respond when Officer Norling called her name.
¶ 32 Upon discovering K.T., Officer Norling called to Deputy Rather to join him upstairs. Deputy Rather ran into Sadler coming down the stairs as he was heading up, and he took Sadler back upstairs. When they approached the bedroom, Officer Norling asked Deputy Rather to detain Sadler. Deputy Rather handcuffed Sadler, patted him down for weapons, and had him sit on the floor. Deputy Rather then looked into the bedroom and saw K.T. on the bed.
¶ 33 When K.T. finally responded to Officer Norling, she moaned and told him that her stomach hurt and that she was dizzy; she did not respond when he asked her how old she was. Deputy Rather called for medical assistance and then left Sadler with Officer Norling to finish his "security sweep." RP (3.5/3.6 Hearing) at 53.
¶ 34 While performing his "security sweep," which he later characterized as a "routine" activity, Deputy Rather entered another room near the bedroom. RP (3.5/3.6 Hearing) at 54-55. The walls of this room were covered with black plastic, and the room contained numerous sexual devices related to BDSM practices as well as a video camera on a tripod. After medical assistance arrived, Officer Norling also looked in this room. In addition to looking into the adjacent rooms, Deputy Rather checked the closets to make sure no one was hiding. At the suppression hearing, neither officer testified *1121 that they had any specific reason to suspect anyone else was in the residence.
¶ 35 After the medical assistance arrived, Deputy Rather escorted Sadler to the living area to get him out of the way. When the medical personnel left with K.T., Deputy Rather turned Sadler over to Officer Norling and joined K.T. at the hospital.
¶ 36 After placing Sadler in a patrol car, Officer Norling contacted his supervisors and waited for them to arrive. At that point, the officers had "secured" the front and back of Sadler's residence, "[s]o no one could enter until [the officers] were able to attempt to obtain a search warrant." RP (3.5/3.6 Hearing) at 22. Detective Jackson from the Pierce County Sheriff's Office arrived a short time later.
¶ 37 At the suppression hearing, Detective Jackson testified that when he arrived at the scene, he contacted the officers, "they briefed [him] on what had happened," and then he and Officer Norling "walked through the residence" using "the same path that the officers used when they first went through." RP (3.5/3.6 Hearing) at 78. He stated that he conducted this walk-through with Officer Norling to "get a layout of the place" so he could describe it in a search warrant affidavit. RP (3.5/3.6 Hearing) at 79. In addition, he testified that when he talked to the officers, they (1) told him they had been in the residence, (2) stated that they had looked in a number of rooms, and (3) described what they had seen inside the residence.
¶ 38 Detective Jackson further stated that, although he and Officer Norling walked through the house to get a general layout, he did not enter the room with the black plastic on the walls, and Officer Norling did not show him anything inside that room. But he admitted that he could see into the room through the open door and that he saw "bondage stuff," like chains, straps, some kind of a box or table, and black sheeting. RP (3.5/3.6 Hearing) at 88. Detective Jackson then went to the hospital, where he talked to a social worker to get any additional information K.T. had disclosed and then to the City-County Building to write the search warrant affidavit.[19] Detective Jackson testified that when he wrote the search warrant affidavit, he listed what he had seen in the house as well as what the officers and K.T. had told him they had seen in the house, but he could not say whether any of the information in the affidavit was based solely on his personal observations.[20]
¶ 39 When he finished writing the affidavit, Detective Jackson obtained a search warrant for Sadler's residence. He then returned to the residence and served the search warrant. As noted above, this search and subsequent searches of Sadler's computer under additional search warrants yielded a significant amount of evidence.
¶ 40 Sadler moved under CrR 3.6 to suppress the evidence discovered when officers executed the various search warrants, arguing that Officer Norling and Deputy Rather's initial entry into his residence was unlawful. Sadler did not assert that Detective Jackson's entry was unlawful or challenge the validity of the search warrants directly. The State responded that the officers' initial entry and security sweep were valid under the emergency or community caretaking exception to the warrant requirement.[21] The testimony at the suppression hearing was consistent with the facts described above.
*1122 ¶ 41 The trial court denied the CrR 3.6 motion. In its written findings of fact, the trial court found that Detective Jackson entered Sadler's residence to "get a description of the house for purposes of writing a search warrant" and that he recorded his own observations in the complaint for the search warrant. Clerk's Papers (CP) at 273. The trial court then concluded that, "Det. Jackson's entry was not improper." CP at 275.

B. Analysis

¶ 42 Sadler contends that Officer Norling and Deputy Rather's initial entry into the house was not justified under the exigent circumstances, emergency, or community caretaking exceptions to the warrant requirement. He further argues that Deputy Rather's "protective sweep" of the residence was not justified and that it exceeded the scope of the original entry and that he did not impliedly consent to the search. Br. of Appellant at 40.
¶ 43 In reviewing a trial court's denial of a suppression motion, we review challenged findings of fact to determine whether substantial evidence supports them. State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. Mendez, 137 Wash.2d at 214, 970 P.2d 722. We review the trial court's conclusions of law de novo, State v. Levy, 156 Wash.2d 709, 733, 132 P.3d 1076 (2006), deferring to the trial court on issues of credibility and weight. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).
¶ 44 We presume that warrantless searches of constitutionally protected areas are unreasonable absent proof that one of the well-established exceptions applies. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Ladson, 138 Wash.2d 343, 349, 979 P.2d 833 (1999). The State bears the burden of establishing an exception to the warrant requirement. State v. Potter, 156 Wash.2d 835, 840, 132 P.3d 1089 (2006).

1. Initial Warrantless Entry
¶ 45 Sadler argues that the emergency exception to the warrant requirement does not apply to the initial entry into his residence because that entry was merely a pretext for conducting an evidentiary search and there was no evidence of an emergency or reason to believe K.T. was in imminent danger of death or injury. This argument has no merit; the facts here clearly support the conclusion that Officer Norling and Deputy Rather lawfully entered Sadler's residence under the emergency exception to the warrant requirement.
¶ 46 The emergency exception to the warrant requirement applies when: (1) an officer subjectively believes someone is in need of assistance for health or safety reasons, (2) a reasonable person in the same situation would believe there was a need for assistance, and (3) there is a reasonable basis to associate the place searched with a need for assistance. State v. Gocken, 71 Wash. App. 267, 276-77, 857 P.2d 1074 (1993). This exception recognizes the community caretaking function of police officers and exists so police can aid citizens and protect property. State v. Menz, 75 Wash.App. 351, 353, 880 P.2d 48 (1994). "When invoking the emergency exception, the State must show that the claimed emergency is not merely a pretext for conducting an evidentiary search." State v. Leffler, 142 Wash.App. 175, 182, 178 P.3d 1042 (2007) (citing State v. Schlieker, 115 Wash.App. 264, 270, 62 P.3d 520 (2003)).
¶ 47 Here, when the officers entered Sadler's house, they knew the following facts: (1) a 14-year-old girl had "disappeared" from her foster home in another county, (2) she had been missing for some time, (3) she was suspected to be involved in sadomasochistic sex, (4) she was inside the home of a significantly older man, (5) the man took some time to come to the door when Officer Norling knocked and rang the doorbell, and (6) the man was sweating profusely and looked surprised when he finally opened the door. And the officers' testimony supports their subjective belief that K.T. was in a potentially dangerous situation that put her health or safety at risk. Furthermore, nothing in the record shows that at the time they entered, *1123 the officers had any purpose other than locating K.T. to ensure her safety.
¶ 48 Additionally, given the risk that K.T., a minor, was involved in a sadomasochistic relationship (a relationship that necessarily implies the infliction of pain on at least one of the parties as well as sexual activity) with an older man, a reasonable person would believe that this circumstance justified immediate entry into Sadler's home to find K.T. and determine that she was not in distress or in need of assistance. A reasonable person could also easily conclude that leaving such a child alone in the presence of someone who may have been engaging in sadomasochistic activities with her to await a warrant would potentially expose that child to additional risks. Finally, once Sadler told the officers that K.T. was inside, the officers had a reasonable basis for believing she was in the residence. Accordingly, the trial court's findings clearly support entry under the emergency or community caretaking exceptions and the facts support those findings. Thus Sadler does not show that the trial court erred by denying his CrR 3.6 motion based on an unlawful initial entry.[22]

2. Scope of Search
¶ 49 Sadler further argues that even if the initial entry was lawful, the officers exceeded the permissible scope of the entry when Deputy Rather conducted a security or protective sweep of the premises. Again, we disagree.
¶ 50 Police may conduct a protective sweep of the premises for security purposes as part of the lawful arrest of a suspect. State v. Hopkins, 113 Wash.App. 954, 959, 55 P.3d 691 (2002) (citing Maryland v. Buie, 494 U.S. 325, 334-35, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). The scope of such a sweep is limited to a visual inspection of only those places where a person may be hiding. Hopkins, 113 Wash.App. at 959, 55 P.3d 691. An officer need not justify his actions in searching the area that immediately adjoins the place of the arrest. Hopkins, 113 Wash. App. at 959, 55 P.3d 691. But if the sweep extends beyond the immediately adjoining area, the officer must be able to point to articulable facts, which, taken together with rational inferences from those facts, warrant a reasonable belief that the area involved in the protective sweep may harbor an individual who poses a danger to those on the scene. Hopkins, 113 Wash.App. at 959-60, 55 P.3d 691. A general desire to make sure that there are no other individuals present is not sufficient to justify an extended protective sweep. Hopkins, 113 Wash.App. at 960, 55 P.3d 691.
¶ 51 Here, (1) the officers took Sadler into custody just outside the upstairs bedroom where they found K.T.; (2) Deputy Rather searched the adjoining rooms and did a cursory search of the floor below, where he detained Sadler for a short time; and (3) nothing in the record suggests that Deputy Rather's search went beyond a cursory visual inspection of only those places where someone could be hiding. Thus, the trial court did not err when it found that Deputy Rather's security sweep was lawful.

3. Second Warrantless Entry
¶ 52 We agree with the trial court that the officers' initial entry and subsequent security sweep were lawful, but we do not agree that Detective Jackson's later entry into Sadler's residence was lawful. First, Detective Jackson entered Sadler's residence without permission. Second, there was no longer an emergency because the officers had removed K.T. from the residence and secured the residence. Having ensured K.T.'s safety, the officers could have easily awaited a search warrant based on Officer Norling's and Deputy Rather's observations (and potentially any statements from K.T.) before they reentered the residence. And, finally, Detective Jackson's sole purpose for entering the residence was to gather information to use in the search warrant affidavit, in other words, to investigate a possible crime; the fact that he merely retraced the other officers' steps was irrelevant to whether his warrantless entry was lawful. Thus, *1124 the trial court's finding that the second entry was proper is incorrect and any information in the search warrant affidavit based on this entry should be struck.
¶ 53 Although the independent source doctrine would likely help resolve this issue, the record does not establish what sources Detective Jackson relied on for each allegation in his search warrant affidavit. In fact, the record does not contain the search warrant or the supporting affidavit and, at the suppression hearing, Detective Jackson did not specify what information came from which source. Furthermore, because the trial court found Detective Jackson's entry was proper, Sadler had no reason to challenge the sufficiency of the search warrant affidavit on this basis at that time.
¶ 54 Accordingly, on remand, the trial court should give Sadler the opportunity to challenge the search warrant affidavit, and the trial court should determine whether the officers would have sought the search warrant without the information Detective Jackson gathered and whether the independent information supports the search warrant. See Murray v. United States, 487 U.S. 533, 542-43, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (trial court must conduct separate factual inquiry into the effect of illegally obtained information upon the officer's decision to seek the warrant); State v. Gaines, 154 Wash.2d 711, 721-22, 116 P.3d 993 (2005); see also State v. Spring, 128 Wash.App. 398, 405, 115 P.3d 1052 (2005), review denied, 156 Wash.2d 1032, 134 P.3d 232 (2006).

III. DENIAL OF CRR 3.5 MOTION
¶ 55 Sadler next challenges the trial court's admission, under CrR 3.5, of his statements to the officers.[23]

A. Additional Related Facts

¶ 56 At the suppression hearing, Officer Norling testified that at about the same time Deputy Rather called for medical help for K.T., he advised Sadler of his Miranda[24] rights, that Sadler acknowledged that he understood his rights, and that Sadler then agreed to talk to him. Deputy Rather testified, however, that he did not hear anyone advise Sadler of his Miranda rights while he was upstairs with Officer Norling and K.T.
¶ 57 Officer Norling also testified that after he advised Sadler of his Miranda rights, he asked Sadler how long K.T. had been with him, and Sadler responded that she had been with him about a week. Sadler then asked why Officer Norling questioned K.T. about her age and said she had told him she was 19. Officer Norling further testified that he believed Sadler asked for a lawyer at this point and that he did not ask Sadler any more questions.
¶ 58 In addition, Officer Norling stated that after the medical team left with K.T., he took Sadler outside to put him in his patrol car. Officer Norling initially said that he did not ask Sadler any questions at this time because Sadler had already requested a lawyer, but he contradicted this testimony a couple of times as his testimony continued. At one point, he stated that Sadler did not request a lawyer until after he was in the patrol car. Officer Norling told Sadler that K.T. was a 14-year-old runaway; in response, Sadler "started yelling that she told [him] that she was 19." RP (3.5/3.6 Hearing) at 21. At another point, he testified that Sadler did hot ask for a lawyer until the officers asked if he would consent to a search of his residence.
¶ 59 Detective Jackson testified that after he walked through Sadler's residence, he went back to Officer Norling's car, told Sadler what they were doing, and advised him that they were going to seek a search warrant for the house. He stated that when he spoke to Sadler, he did not intend to engage him in conversation because he knew that Sadler had already been advised of his rights and was not waiving those rights "so it was just information just for him, just to kind of keep him up to speed." RP (3.5/3.6 Hearing) *1125 at 80. After he told Sadler this, Sadler "said a couple of times that he thought ... the girl was 19." RP (3.5/3.6 Hearing) at 80. Detective Jackson stated that he then told Sadler that he was not asking him any question so he should not say anything, that he knew Sadler had not waived his rights, and that he was just there to tell Sadler what was going on.
¶ 60 The trial court's findings of fact stated in part:
11. Officer Norling read the defendant his Miranda warnings with the assistance of a department issued card. The defendant stated that he understood his warnings and wished to speak with Officer Norling. The defendant did not appear confused and was able to track Officer Norling's statements and questions appropriately.
12. After being asked, the defendant stated that K.T. had been staying with him for about a week and said, "She told me she was 19."
13. The defendant was placed in Officer Norling's patrol car. Officer Norling stated that he told the defendant that K.T. was a runaway and was 14 years old. The defendant yelled, "She told me she was 19."
14. Officer Norling later asked the defendant if police could search his residence. The defendant stated that he wanted an attorney.
. . . .
16. After Det. Jackson viewed the inside of the defendant's residence, he approached the defendant, who was still sitting in a patrol car, and, as a courtesy, told him that he would be requesting a search warrant for the residence and that he would be looking for evidence. Det. Jackson also told the defendant that K.T. was a 14-year-old runaway. In response to the Det. Jackson's statements, the defendant stated, "She told me she was 19." Det. Jackson reminded the defendant that he asked for an attorney and not to say anything. Det. Jackson told the defendant that he was just informing him of the status of the investigation, to which the defendant again stated, "She told me she was 19."
CP at 272-73.
¶ 61 The trial court concluded:
7. The defendant was in-custody at the time Officer Norling read the defendant his Miranda warnings.
8. Officer Norling properly read the defendant his Miranda warnings.
. . . .
10. The defendant's statements to Det. Jackson were made spontaneously by the defendant and were not made as a result of custodial interrogation. Those statements are also admissible at trial.
CP at 275.

B. Analysis

¶ 62 Sadler contends that the trial court erred when it admitted his statements to Officer Norling and Detective Jackson, arguing that (1) the record does not support the trial court's conclusion that Officer Norling advised him of his Miranda rights before Sadler made any statements and (2) Sadler's statements to Detective Jackson were not spontaneous but were instead intentionally elicited by Detective Jackson despite that Sadler had already stated that he wanted an attorney. We disagree.
¶ 63 Sadler argues that while Officer Norling testified that he read him his Miranda warnings shortly after Deputy Rather detained him, Deputy Rather testified that he did not hear Officer Norling advise Sadler of his rights at that time; thus, the record does not support a finding that Officer Norling read him his Miranda rights shortly after he was officially detained. This argument has no merit because the two officers' statements are not necessarily inconsistent. It is conceivable that Deputy Rather did not hear Officer Norling read Sadler his rights because Deputy Rather was performing other duties during this time and his focus was elsewhere. Even if we preferred to resolve this factual dispute differently, the trial court's finding is supported by substantial evidence and we are bound to affirm it. See Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 879-80, 73 P.3d 369 (2003).
*1126 ¶ 64 Although Sadler also attempts to question the accuracy of Officer Norling's testimony by pointing out that he stated Sadler invoked his right to counsel at three different times, that argument does not change the above conclusion. The record shows that Officer Norling's testimony about when Sadler requested counsel was confusing and that he appeared to state that Sadler requested counsel at three different points in time, but his testimony regarding when he advised Sadler of his Miranda rights was straightforward and consistent. And, again, the weight accorded to Officer Norling's testimony regarding when he advised Sadler of his Miranda rights is an issue we do not address.
¶ 65 Sadler next contends that the trial court erred when it concluded that "[t]he defendant's statements to Det. Jackson were made spontaneously by the defendant and were not made as a result of custodial interrogation." CP at 275. He argues Detective Jackson's statements to him were reasonably likely to elicit an incriminating response. Again, this argument has no merit.
¶ 66 Federal and state constitutions guarantee the privilege against self incrimination. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; In re Pers. Restraint of Ecklund, 139 Wash.2d 166, 172, 985 P.2d 342 (1999). "Miranda warnings were designed to protect a defendant's right not to make incriminating statements while in police custody." State v. Lorenz, 152 Wash.2d 22, 36, 93 P.3d 133 (2004) (citing State v. Harris, 106 Wash.2d 784, 789, 725 P.2d 975 (1986)). But Miranda does not apply to voluntary, spontaneous statements made outside the context of custodial interrogation. Miranda, 384 U.S. at 478, 86 S.Ct. 1602; State v. Ortiz, 104 Wash.2d 479, 484, 706 P.2d 1069 (1985). "The general rule is that a statement is voluntary if it is made spontaneously, is not solicited, and not the product of custodial interrogation." Ortiz, 104 Wash.2d at 484, 706 P.2d 1069.
¶ 67 Here, Detective Jackson merely advised Sadler that he intended to apply for a search warrant. He did not ask Sadler any questions, let alone any specific questions about his contact with K.T. or what K.T. had told him about her age. Merely telling a suspect about the status of the investigation is not reasonably likely to elicit a response. Furthermore, Sadler's statement that K.T. had told him she was 19 is not related to the information Detective Jackson gave Sadler at that time. These facts are sufficient to support the trial court's conclusion that Sadler's statement to Detective Jackson was spontaneous and voluntary.
¶ 68 Accordingly, Sadler does not show that the trial court erred when it admitted his statements to the officers.

IV. VAGUENESS CHALLENGE
¶ 69 Finally, in his pro se SAG, Sadler contends that the statutory affirmative defense to sexual exploitation of a minor is unconstitutionally vague as applied, asserting that the phrase "requiring production" is too ambiguous because it is unclear whether the "production" element can be satisfied if a person shows the identification via a webcam. SAG at 3 (quoting RCW 9.68A.110(3)). Assuming, without deciding, that a statutory affirmative defense can be subject to a vagueness challenge, this argument has no merit.

A. Additional Related Facts

¶ 70 As noted above, at trial Sadler admitted that he had photographed K.T. engaging in a variety of sexually explicit conduct. But he also asserted that he had established the statutory affirmative defense to the sexual exploitation of a minor charges because he proved that K.T. had shown him a Michigan birth certificate and a Washington driver's license or identification establishing her age as 19 through a webcam. As previously noted, this defense required Sadler to prove that he
made a reasonable bona fide attempt to ascertain the true age of the minor by requiring production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper and did not rely solely on *1127 the oral allegations or apparent age of the minor.
RCW 9.68A.110(3).
¶ 71 The State attempted to show Sadler's assertion that K.T. showed him identification via webcam was not credible and that even if K.T. had shown him identification in this way, this was not a reasonable bona fide attempt to establish her age by requiring production of such documentation. Although most of the State's evidence and argument focused on whether viewing identification via a webcam was a reasonable bona fide attempt to verify K.T.'s age, the State also briefly suggested in its rebuttal closing argument that viewing identification over a webcam did not amount to "requiring production" of the required documentation.[25]
¶ 72 During its deliberations, while another attorney was standing in for defense counsel, the jury sent a question to the trial court asking it to define the phrase "requiring production" as used in jury instruction 27.[26] With the prosecutor's and stand-in counsel's approval, the trial court instructed the jury that it would not receive any additional instructions.
¶ 73 A short time later, the jury returned its verdict. But, before the trial court could read it, defense counsel returned and informed the trial court that he had discussed the jury question with stand-in counsel and had just emailed the trial court a proposed supplemental instruction responding to the jury's question.[27] Defense counsel asserted that this additional instruction was necessary because "production" was not a term of common understanding but, instead, a "legal definition." RP at 2690. The trial court refused to give the jury the proposed instruction and read the verdict.

B. Analysis

¶ 74 The constitutionality of a statute is an issue of law that we review de novo. State v. Watson, 160 Wash.2d 1, 5-6, 154 P.3d 909 (2007). The standard for finding a statute unconstitutionally vague is high because a statute is presumed to be constitutional. Watson, 160 Wash.2d at 11, 154 P.3d 909 (citing State v. Coria, 120 Wash.2d 156, 163, 839 P.2d 890 (1992)). One who challenges a statute's constitutionality for vagueness bears the burden of proving beyond a reasonable doubt that it is unconstitutionally *1128 vague. Watson, 160 Wash.2d at 11, 154 P.3d 909 (citing City of Spokane v. Douglass, 115 Wash.2d 171, 178, 795 P.2d 693 (1990)). The presumption in favor of a law's constitutionality should be overcome only in exceptional cases. Watson, 160 Wash.2d at 11, 154 P.3d 909 (quoting City of Seattle v. Eze, 111 Wash.2d 22, 28, 759 P.2d 366 (1988)). Because RCW 9.68A.110(3) does not involve First Amendment rights, we evaluate its constitutionality as applied to the facts of this case. See Watson, 160 Wash.2d at 6, 154 P.3d 909 (quoting Coria, 120 Wash.2d at 163, 839 P.2d 890).
¶ 75 A statute is void for vagueness if either: (1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed; or (2) the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement. Watson, 160 Wash.2d at 6, 154 P.3d 909 (quoting State v. Williams, 144 Wash.2d 197, 203, 26 P.3d 890 (2001)). Sadler asserts he is challenging the statutory defense statute on both grounds.
¶ 76 Under the first ground, "[t]he due process clause of the fourteenth amendment to the United States Constitution requires statutes to provide fair notice of the conduct they proscribe." Watson, 160 Wash.2d at 6, 154 P.3d 909 (citations omitted). To meet this standard, "the language of a penal statute `must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.'" Watson, 160 Wash.2d at 6-7, 154 P.3d 909 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). "A statute fails to provide the required notice if it `either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" Watson, 160 Wash.2d at 7, 154 P.3d 909 (quoting Connally, 269 U.S. at 391, 46 S.Ct. 126).
¶ 77 But because "`[s]ome measure of vagueness is inherent in the use of language,'" Watson, 160 Wash.2d at 7, 154 P.3d 909 (alteration in original) (quoting Haley v. Med. Disciplinary Bd., 117 Wash.2d 720, 740, 818 P.2d 1062 (1991)), we "do not require `impossible standards of specificity or absolute agreement.'" Watson, 160 Wash.2d at 7, 154 P.3d 909 (quotations omitted). "[V]agueness in the constitutional sense is not mere uncertainty," and "a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his [or her] actions would be classified as prohibited conduct." Watson, 160 Wash.2d at 7, 154 P.3d 909 (quotations omitted) (alteration in original). Given this, "a statute meets constitutional requirements `[i]f persons of ordinary intelligence can understand what the ordinance proscribes, notwithstanding some possible areas of disagreement.'" Watson, 160 Wash.2d at 7, 154 P.3d 909 (alteration in original) (quoting Douglass, 115 Wash.2d at 179, 795 P.2d 693).
¶ 78 Under the second ground, "the due process clause requires that a penal statute provide adequate standards to protect against arbitrary, erratic, and discriminatory enforcement." Douglass, 115 Wash.2d at 180, 795 P.2d 693. A statute is unconstitutionally vague on this ground if it "`contain[s] no standards and allow[s] police officers, judge, and jury to subjectively decide what conduct the statute proscribes or what conduct will comply with a statute in any given case.'" Douglass, 115 Wash.2d at 181, 795 P.2d 693 (quoting State v. Maciolek, 101 Wash.2d 259, 267, 676 P.2d 996 (1984)). The statute must "provide `minimal guidelines... to guide law enforcement.'" Douglass, 115 Wash.2d at 181, 795 P.2d 693 (quoting State v. Worrell, 111 Wash.2d 537, 544, 761 P.2d 56 (1988)). But these determinations are not made in a vacuum, rather, the question is whether "[t]he terms are not inherently subjective in the context in which they are used." Worrell, 111 Wash.2d at 544, 761 P.2d 56 (emphasis added). Additionally, the mere fact that a statute may require some degree of subjective evaluation by a police officer to determine whether the statute applies does not mean the statute is unconstitutionally vague. Am. Dog Owners Ass'n v. City of Yakima, 113 Wash.2d 213, 216, 777 P.2d 1046 (1989). "Under the due *1129 process clause, the enactment is unconstitutional only if it invites an inordinate amount of police discretion." Douglass, 115 Wash.2d at 181, 795 P.2d 693 (citing Am. Dog Owners Ass'n, 113 Wash.2d at 216, 777 P.2d 1046).
¶ 79 Sadler contends that the statutory affirmative defense is unconstitutionally vague as applied here because the phrase "requiring production" is too ambiguous. He asserts that a reasonable person would not understand that viewing identification via a webcam would not satisfy the "production" element of the defense and that the phrase "requiring production" is too vague to protect against arbitrary, erratic, or discriminatory enforcement.
¶ 80 Sadler's argument focuses on whether viewing identification over a webcam can ever meet the "production" requirement of the statutory defense. Although a brief portion of the State's rebuttal argument suggested that viewing identification over a webcam was not "production," and the jury's question to the trial court during its deliberations suggested that the jury's discussions focused to some extent on the meaning of the phrase "requiring production," the jury was never instructed that viewing identification via a webcam was not sufficient to show "production." Furthermore, when taken in context, the State's argument focused extensively on whether viewing identification over the web without the opportunity to examine it fully was a reasonable bona fide attempt to ascertain K.T.'s true age given the circumstances of this case. Thus, the crux of the defense was really whether the jury believed Sadler's assertion that K.T. showed him identification over the web and whether the jury believed that viewing the identification over the web was a reasonable bona fide attempt to identify K.T.'s true age given the surrounding circumstances.
¶ 81 On these facts, we cannot conclude that the term "production" was unconstitutionally vague. Instead, given the argument and instructions in this case, the determining factor was whether Sadler's alleged attempts to verify K.T.'s age were reasonable. Although a reasonableness standard is not precise, Sadler does not show that this standard is so vague a person of ordinary intelligence would not understand what behavior was prohibited or that it invites an inordinate amount of police discretion. Thus, Sadler's vagueness challenge fails.
¶ 82 In sum, we hold that (1) the trial court violated Sadler's constitutional right to an open public trial when it held the Batson hearing in the jury room, (2) the trial court erred when it concluded that a second warrantless entry into Sadler's residence by law enforcement for the sole purpose of obtaining information to support a search warrant application was lawful, (3) the trial court properly admitted Sadler's statements to law enforcement, and (4) Sadler's vagueness argument is without merit. Accordingly, we reverse the convictions for sexual exploitation of a minor and remand for a hearing on the validity of the search warrant under the independent source doctrine and, if the search warrant is valid and the State chooses to retry Sadler, for a new trial.
I concur: HOUGHTON, P.J.
HUNT, J. (dissent).
¶ 83 Although I agree that the best practice is to conduct Batson hearings in open court, I respectfully dissent from the majority's remand for a new trial. I disagree with the majority's holding that the trial court's jury-room Batson hearing here violated Stanley Sadler's public trial right such that reversal of his convictions is required. No case mandates reversal under the unique circumstances here, which differ from those in cases where remand for a new trial was the only remedy. See, e.g., Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
¶ 84 Rather than mandating reversal here, case law supports the conclusion that the trial court did not violate Sadler's right to a public trial by hearing counsel's Batson arguments (1) in the jury room, outside the presence of the large jury venire, which remained in the courtroom; (2) absent a showing that the general public was excluded from these jury room arguments; and (3) especially when, in reaching its Batson decision, the trial court did not rely on any evidence other *1130 than that previously taken in the courtroom.[28]
¶ 85 The record does not support the majority's assumption that the trial court excluded the public from the jury room during Sadler's Batson hearingnowhere does the record reflect that the trial court expressly excluded anyone from the jury room colloquy, other than the large jury venire, whom the court instructed to remain in the courtroom.[29] Moreover, there is no indication in the record that any non-jury member of the public was present in the courtroom, let alone was excluded from the jury room arguments.[30]
¶ 86 Division One confronted an analogous record concerning jury room voir dire of some individual jurors in State v. Momah.[31] In that case, the court noted:
[T]here is nothing in the record to indicate that any member of the public (including members of Dr. Momah's family) or the press was excluded from voir dire. The court reporter in this case scrupulously recorded everything that took place during the morning session from the time the trial judge, both parties' counsel, Dr. Momah, and the court reporter went into chambers adjacent to the presiding courtroom. Similarly, the court reporter also scrupulously recorded all that took place from the time the trial judge, counsel, Dr. Momah, and the court reporter went into the jury room in room West 813 after the noon recess. Other than the entry and exit of the individual jurors and the questioning that ensued for each, there is nothing in this record indicating any attempt by either the press or the public (including members of Dr. Momah's family) to gain admittance to witness voir dire. We simply do not know what would have happened if such an attempt had been made either during the morning or afternoon sessions of voir dire. We will not speculate on whether the trial court would have ordered closure if any attempt had been made by anyone to join the judge, counsel, Dr. Momah, and the court reporter in chambers or in the jury room.
State v. Momah, 141 Wash.App. 705, 712, 171 P.3d 1064 (2007), review pending, 163 Wash.2d 1012, 180 P.3d 1291 (April 1, 2008). In noting that it would not engage in speculation, Division One contrasted the facts in Momah with cases in which the trial court's *1131 exclusion of public had been explicit; in those distinguished cases, the "plain language" of the trial court's ruling made clear that the trial court had imposed a closure of the courtroom, thus triggering application of the Bone-Club factors. Momah, 141 Wash.App. at 713-14, 171 P.3d 1064. Such was not the case, however, in Momah, and such is not the case here.
¶ 87 As in Momah, the court reporter here "scrupulously recorded everything" that occurred during the jury room Batson colloquy. Similarly, here, "[w]e [should] not speculate on whether the trial court would have ordered closure if any attempt had been made by anyone to join the judge, counsel, [the defendant], and the court reporter ... in the jury room." 141 Wash.App. at 712, 171 P.3d 1064.
¶ 88 I would apply Division One's Momah holding here. In my view, something more is required to warrant the majority's holding that the trial court excluded the public from the jury room Batson colloquy. On the record before us, there has been no showing of denial of Sadler's constitutional right to a public trial such that reversal of his convictions and remand for a new trial is required under Bone-Club, especially where it is uncontroverted that no jury voir dire occurred during the jury room colloquy. I would affirm.[32]
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] RAP 10.10.
[3] Both through counsel and in his pro se SAG, Sadler raises numerous additional issues. Because we reverse Sadler's convictions and remand for further proceedings based on the denial of his right to a public trial, we address only those issues that could affect the State's ability to retry Sadler or those that may arise again on retrial.
[4] This evidence included (1) a wide variety of items that were sexual in nature and related to bondage, discipline, and sadomasochistic practices; (2) a, digital camera; and (3) Sadler's computer. The camera and computer contained photographs of K.T. engaged in a variety of sexually explicit conduct. The later search warrants authorizing an additional forensic search of Sadler's computer revealed additional sexually explicit photographs of K.T., including photos of her interacting with a variety of BDSM related items that the police found in Sadler's house during the initial search. It also revealed e-mails containing sexually explicit pictures of K.T. that Sadler sent to three people as well as numerous instant-message chats.
[5] The State also charged Sadler with: (1) one count of first degree kidnapping with sexual motivation, (2) three counts of third degree child rape, (3) twenty-three counts of possession of depictions of minors engaged in sexually explicit conduct with sexual motivation, and (4) three counts of dealing in depictions of minors engaged in sexually explicit conduct. The jury acquitted Sadler on these charges and they are not at issue in this appeal.
[6] Before trial, K.T. ran away from another foster home; she was unavailable at trial.
[7] In this context, a minor is any person under 18. RCW 9.68A.011(4).
[8] Section 22 provides in relevant part:

In criminal prosecutions the accused shall have the right ... to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases[.]
[9] The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."
[10] Article I, section 10 of the Washington Constitution gives the public and the press a right to open and accessible court proceedings. Section 10 provides: "Justice in all cases shall be administered openly, and without unnecessary delay." In State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995), our Supreme Court held that the same closure standards apply for both section 10 and section 22 rights.
[11] In Waller, the United States Supreme Court noted that "[t]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Waller, 467 U.S. at 46, 104 S.Ct. 2210 (quotations omitted). As succinctly put by the California Court of Appeals,

This benefit of public oversight or superintendence accruing to a criminal defendant as a result of the openness inherent in a truly public trial is largely lost if the only openness attending the trial proceedings (or any portion thereof) is to be found in an after-the-fact review of a cold written record of proceedings to which the public had no access.
People v. Harris, 10 Cal.App.4th 672, 685, 12 Cal.Rptr.2d 758 (Cal.Ct.App.1992) (emphasis added).
[12] Under Bone-Club:

1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose.
Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325 (alteration in original) (quotation omitted).
[13] Although the State notes that Sadler did not object to the trial court considering the Batson challenge in the jury room, any assertion that Sadler's failure to object waived his right to bring this issue on appeal has no merit. The record does not show that the trial court ever advised Sadler of his right to a public trial or asked him to waive this right, and case law clearly requires that the trial court ensure the defendant is aware of his right to public trial before waiver can occur. Bone-Club, 128 Wash.2d at 261, 906 P.2d 325 ("[T]his court has held an opportunity to object holds no `practical meaning' unless the court informs potential objectors of the nature of the asserted interests.") (quoting Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 39, 640 P.2d 716 (1982)).
[14] The Supreme Court heard oral argument in this case on June 10, 2008. State v. Erickson, ___ Wash.App. ___, 189 P.3d 245, 249 n. 4 (2008).
[15] We note that even absent being sworn as a witness, attorneys have an independent obligation to provide truthful information to the court under the rules of professional conduct. RPC 3.3(a)(1) (a lawyer shall not knowingly "make a false statement of fact or law to a tribunal[.]").
[16] A trial court's ruling on a Batson challenge will be upheld "unless it is clearly erroneous." Snyder, 128 S.Ct. at 1207; Hicks, 163 Wash.2d at 486, 181 P.3d 831 (quoting State v. Luvene, 127 Wash.2d 690, 699, 903 P.2d 960 (1995) (quoting Hernandez, 500 U.S. at 369, 111 S.Ct. 1859)). This standard of review also supports the conclusion that the trial court is not addressing purely legal issues, which we would normally review de novo.
[17] We note that we do not hold that a trial court can never consider a Batson challenge in a closed proceeding outside the public forum. Such a proceeding may be permissible if the trial court first conducts a proper Bone-Club inquiry.
[18] The State argues that Sadler cannot attempt to suppress evidence found when the police executed the search warrant because he did not argue below that the search warrant affidavit would be insufficient if any of the information in it was excluded due to an initial unlawful entry. In effect, the State argues that Sadler cannot challenge the evidence found in the search unless he established below that the independent source doctrine did not apply. This argument is difficult to understand. The trial court found that the officers' entries were lawful, thus, Sadler had no reason to challenge the sufficiency of the search warrant affidavit.
[19] The search warrant and search warrant affidavit were not admitted below and are not part of the appellate record. Additionally, at the suppression hearing, none of the parties discussed the content of the search warrant affidavit with any specificity.

On October 3, 2007, apparently anticipating that we might want to address the independent source doctrine, the State filed a motion to allow additional evidence asking that we review the search warrant under RAP 9.11. The State attached a copy of the search warrant and Detective Jackson's affidavit to this motion. On October 12, 2007, our commissioner denied this motion.
[20] He stated only that everything in the affidavit was "either something that [he] saw or [the other officers] described for [him] or that [K.T.] described for [him]." RP (3.5/3.6 Hearing) at 90.
[21] In addition, the State moved under CrR 3.5 to admit Sadler's custodial and non-custodial statements to Officer Norling, Deputy Rather, and Detective Jackson. We present the facts related to the CrR 3.5 hearing below.
[22] Because we conclude that the initial entry was valid under the emergency exception to the warrant requirement, we do not address whether exigent circumstances also existed or whether Sadler impliedly consented to the entry.
[23] During trial, the State attempted to use Sadler's statements to the officers to show that Sadler told the officers only that K.T. had told him she was 19, not that she had shown him identification proving she was 19.
[24] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[25] Specifically, it argued:

Instruction No. 27 requires production of the identification, not a request to see it on a webcam. When someone goes to buy alcohol or cigarettes or something like that, the store clerk doesn't say, can you give me a copy of your driver's license. They need to see the actual license, the actual document, production of the document. Not show it to me; prove it to me.
And the Defendant, the adult, is burdened with making sure that their attempt at getting this documentation is a bona fide attempt. A good faith attempt. Even if you believe the Defendant when he says she showed me a birth certificate, regardless of the fact that he cannot give you details about when he saw it, what it looked like, he didn't write it down anywhere that anybody knows of, or any of those things, despite that, even if you believe the Defendant when he says I asked her for a copy, or she showed me her birth certificate on the webcam, according to the law, that is not enough. The law requires production, not seeing it over a fuzzy webcam, production of the document.
RP at 2670-71 (emphasis added).
[26] Jury Instruction 27 provided:

It is not a defense to the charge of sexual exploitation of a minor that at the time of the offense the defendant did not know the age of K.T. or that the defendant believed her to be older.
It is, however, a defense to the charge of sexual exploitation of a minor that at the time of the offense the defendant made a reasonable bona fide attempt to ascertain the true age of the minor by requiring production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper and did not rely solely on the oral allegations or apparent age of the minor[.]
This defense must be established by the defendant by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find the defendant has established this defense, it will be your duty to return a verdict of not guilty on all of the sexual exploitation of a minor counts.
CP at 427 (emphasis added).
[27] The proposed instruction, which defense counsel asserted was based on the dictionary definition of "production," stated: "The term production means the act of producing, or to offer to view or notice." CP at 397.
[28] It is undisputed that the jury room arguments took place in Sadler's presence, with the prosecutor, defense counsel, and the court reporter in attendance.
[29] Before entering the jury room, the trial court stated on the record, apparently to the jury venire, "We are going to step into the jury room for one matter on the record. Just don't leave the courtroom." Report of Proceedings (RP) (May 10, 2006) at 855.
[30] Inside the jury room, the State remarked, "I am not sure, Judge, but we should probably make a record that we are in the jury room with all counsel and the Defendant present having this hearing outside the presence of the jury, but not the Defendant." RP (May 10, 2006) at 862-63.
[31] In Momah, Division One of our court recognized the trial court's reasonable exercise of discretion in conducting individual juror voir dire in the jury room, away from the venire in the courtroom, in order to prevent contaminating the rest of the jurors concerning prior knowledge of this high-profile case. There were many jurors remaining in the courtroom and some even outside in the hall; there neither enough space nor chairs to move them all into the jury room. Writing for the majority, Judge Cox noted, "[L]imited seating by itself is insufficient to violate the defendant's public trial right." State v. Momah, 141 Wash.App. 705, 709, 171 P.3d 1064 (2007), review pending, 163 Wash.2d 1012, 180 P.3d 1291 (April 1, 2008).

Judge Brown's dissent in State v. Duckett, 141 Wash.App. 797, 812, 173 P.3d 948 (2007), is also instructive. In that case, the trial court interviewed individual jurors in the jury room concerning private sexual abuse issues noted on their confidential juror questionnaires. In addition to defending the trial court's action in protecting juror privacy, Judge Brown similarly noted:
I do not believe any closure occurred.... The judge never actually ordered the public excluded or the courtroom closed. We do not know if any members of the public were actually present when the procedures were discussed and adopted or may have been excluded. No public objections are recorded. Recently, these similarities helped influence Division One of this court to reject public trial defect contentions in State v. Momah, 141 Wash.App. 705, 716, 171 P.3d 1064 (2007) (declining to follow [State v.] Frawley, [140 Wash.App. 713, 724, 167 P.3d 593 (2007)] to the extent it "holds that all in-chambers proceedings are per se closed to the public").
[32] Alternatively, rather than reversing Sadler's convictions summarily, we could (1) stay our opinion pending the Supreme Court's decision in Momah or (2) remand to the trial court to conduct a reference hearing to determine whether the public was actually excluded from the Batson arguments in the jury room and to enter findings on whether the court received any evidence during the jury room hearing that bore on its Batson decision. Only after such a remand hearing might I be able to concur in the majority's reversal and remand for a new trial. Given the present state of the record before us, however, I cannot.