171 P.3d 1064 (2007)
STATE of Washington, Respondent,
v.
Dr. Charles MOMAH, Appellant.
No. 58004-3-I.
Court of Appeals of Washington, Division 1.
November 13, 2007.
Prosecuting Atty. King County, King Co. Pros./App. Unit Supervisor, Lee Davis Yates, King County Prosecutor's Office, Seattle, WA, for Respondent.
Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Jeffrey L. Fisher, Davis Wright Tremaine LLP, Seattle, WA, for Appellant.

PUBLISHED IN PART
COX, J.
¶ 1 Dr. Charles Momah appeals his judgment and sentence based on convictions of *1065 rape and indecent liberties involving several of his medical patients. We hold that he has failed to carry his burden to show that the trial court violated his constitutional right to a public trial by the manner in which the court conducted voir dire of potential members of the jury who were questioned individually. The court did not abuse its discretion by admitting evidence of certain of Dr. Momah's prior bad acts under the common scheme or plan exception. Likewise, the court did not abuse its discretion by excluding evidence of alleged prior bad acts of one of the witnesses against Dr. Momah. The court properly exercised its discretion in denying Dr. Momah's motion to sever. And the court did not abuse its discretion in denying his mistrial motion. We affirm.
¶ 2 Dr. Momah was a gynecologist and purported fertility specialist with offices in Burien and Federal Way. In 2003, one of his patients, H.P., went to a hospital and reported that Dr. Momah had raped her. Once the allegations were made public, many other women came forward with complaints that Dr. Momah had sexually abused them. These allegations became the subject of extensive media coverage.
¶ 3 After investigation, the State charged Dr. Momah with seven counts arising from these incidents. Three of the counts were severed from the trial in this case. The remaining four counts were tried in this action, including two counts of indecent liberties, one count of second-degree rape, and one count of third-degree rape.
¶ 4 Due to the nature of the charges and the extensive media coverage, a large number of potential jurors were called for voir dire by the parties and the court. Some of the potential jurors asked to be questioned individually, and the court and both counsel agreed to honor those specific requests. Some jurors had been exposed to media coverage about the case, also requiring individual juror questioning to avoid jury contamination. We discuss in more detail later in this opinion how voir dire was conducted.
¶ 5 Following the selection of the jurors and alternates, the matter was tried over the course of 15 trial days. The jury found Dr. Momah guilty as charged.
¶ 6 He appeals.

RIGHT TO PUBLIC TRIAL
¶ 7 Dr. Momah argues that the trial court violated his right to a public trial by the manner in which it conducted voir dire of the prospective jurors who were questioned individually. Because he fails in his burden to show there was a constitutional violation in this case, we disagree.
¶ 8 Article I, section 22 of the Washington State Constitution guarantees criminal defendants the right to a speedy, public trial. Similarly, article I, section 10 provides that "[j]ustice in all cases shall be administered openly. . . ." These rights extend to jury selection, which is essential to the criminal trial process.[1]
¶ 9 To protect these rights, a court faced with a request for a trial closure must weigh five factors, referred herein as the Bone-Club factors, to balance the competing constitutional interests.[2] To overcome the presumption of openness, the party seeking closure must show an overriding interest that is likely to be prejudiced and that the closure is narrowly tailored to serve that interest.[3] The trial court must consider alternatives and balance the competing interests on the record.[4]
¶ 10 This test mirrors the one articulated by the United States Supreme Court to protect the Sixth Amendment right to a public trial and the First Amendment right to open hearings.[5]
*1066 ¶ 11 We look to the plain language of the closure request and order to determine whether closure occurred, thus triggering the Bone-Club factors.[6]
¶ 12 Once the reviewing court determines there has been a violation of the constitutional right to a public trial right, "[p]rejudice is presumed," and a new trial is warranted.[7]
¶ 13 On the other end of the spectrum from a full closure is a trial court's inherent authority and broad discretion to regulate the conduct of a trial.[8] Thus, a "closure" in which one disruptive spectator is excluded from the courtroom for good cause will not violate the defendant's right to a public trial even absent an analysis of the Bone-Club factors.[9] Likewise, limited seating by itself is insufficient to violate the defendant's public trial right.[10]
¶ 14 Here, Dr. Momah focuses his argument exclusively on the events of October 11, 2005, the second day of voir dire. It is undisputed that he neither bases his argument on any other day of voir dire nor does he object to voir dire for reasons other than those described below.[11]
¶ 15 On the second day of voir dire, the court convened the trial in Room E-942, the presiding courtroom in the King County Courthouse.[12] During the prior day of voir dire, 48 potential jurors were excused, leaving 52 potential jurors to be examined further.[13] The record reflects the following exchanges between the court and counsel for the parties regarding questioning of the remaining potential jurors:
THE COURT: . . . I made a list of jurors who wanted to have private questioning about various issues. On that list I have eight jurors who wanted private questioning.
. . . .
MR. ALLEN [counsel for Dr. Momah]: Your Honor, it is our position and our hope that the Court will take everybody individually, besides those ones we have identified that have prior knowledge. Our concern is this: they may have prior knowledge to the extent that that might disqualify themselves, or we have the real concern that they will contaminate the rest of the jury.
. . . .
MR. ROGOFF [counsel for the State]: I agree.[[14]]
¶ 16 Thereafter, the court divided the prospective jurors who were to be questioned individually into two groups, the first group of 20 to be questioned that morning. The rest were released with instructions to return for questioning that afternoon.
¶ 17 Shortly after the release of the potential jurors, the record reflects that the court, both parties' counsel, Dr. Momah, and the court reporter moved into chambers adjoining the presiding courtroom. Once in chambers, the record states:
THE COURT: We have moved into chambers here. The door is closed. We have the court reporter present, as well as *1067 all counsel and the defendant, along with the Court and juror number 36. . . . [[15]]
¶ 18 Following questioning by counsel and the court, prospective juror number 36 left chambers and prospective juror 2 entered chambers. The record does not reflect whether the door to chambers was closed during this questioning or subsequent individual questioning of other prospective jurors during the morning session.
¶ 19 The court recessed for lunch and reconvened in room West 813 of the King County Courthouse for the afternoon session. The record reflects the following statement by the court prior to the arrival of the second group of prospective jurors:
THE COURT: I guess we have twenty folks outside in the hall. What I propose to do is have them come into the courtroom, we will move to the jury room for the individual questioning, and question them one at a time. I thought about having them in the jury room, but there is [sic] only 16 chairs. Secondly, we reserved 50 jurors for tomorrow.[[16]]
¶ 20 After further colloquy between the court and counsel, the prospective jurors entered the courtroom. The trial judge explained to the group that individual questioning would continue and then adjourned to the jury room with the lawyers for both parties, Dr. Momah, and the court reporter. The record does not reflect whether the door to the jury room was open or closed during any of the individual examinations of the prospective jurors that afternoon.
¶ 21 Court adjourned for the day at 3:10 p.m., after prospective juror number 41 left the jury room.
¶ 22 Dr. Momah makes two main arguments. First, he argues that this record establishes that the trial court closed voir dire, infringing on his right to a public trial. Second, he argues that this record supports the view that the burden of proving there was no closure and that the requirements of Bone-Club and its progeny were fulfilled shifted to the State. We disagree with both of these arguments.
¶ 23 Nowhere in this record is there any evidence that the trial judge expressly closed voir dire to the public or the press in violation of any of the controlling cases. Rather, the record expressly shows that the court, in response to the express request of Dr. Momah, agreed to allow voir dire by individual questioning of prospective jurors who indicated prior knowledge about the case. Significantly, his request was based on the concern that prospective jurors might have knowledge about the case that could disqualify them or that they might contaminate the rest of the prospective jurors with such knowledge. In addition, the court and the parties agreed to individually question jurors in response to their express requests. The State agreed that individual questioning was best to avoid the risk of a mistrial due to certain matters that are not relevant to our analysis in this case. There simply is no indication in the record that individual questioning was for the purpose of excluding either the press or the public from this trial.
¶ 24 We note also that there is nothing in the record to indicate that any member of the public (including members of Dr. Momah's family) or the press was excluded from voir dire. The court reporter in this case scrupulously recorded everything that took place during the morning session from the time the trial judge, both parties' counsel, Dr. Momah, and the court reporter went into chambers adjacent to the presiding courtroom. Similarly, the court reporter also scrupulously recorded all that took place from the time the trial judge, counsel, Dr. Momah, and the court reporter went into the jury room in room West 813 after the noon recess. Other than the entry and exit of the individual jurors and the questioning that ensued for each, there is nothing in this record indicating any attempt by either the press or the public (including members of Dr. Momah's family) to gain admittance to witness voir dire. We simply do not know what would have happened if such an attempt had been made either during the morning or afternoon sessions of voir dire. We will not *1068 speculate on whether the trial court would have ordered closure if any attempt had been made by anyone to join the judge, counsel, Dr. Momah, and the court reporter in chambers or in the jury room.
¶ 25 Dr. Momah relies on the seminal Washington cases on courtroom closure. But the closures in each of those cases are distinguishable in important respects from the October 11 day of voir dire in this case.
¶ 26 In State v. Bone-Club, the trial court "ordered closure" of the courtroom by stating, "All those sitting in the back, would you please excuse yourselves at this time."[17] In discussing whether the defendant could have waived his rights, the supreme court noted, "The motion to close, not Defendant's objection, triggered the trial court's duty to perform the weighing procedure."[18]
¶ 27 Similarly, in In re Personal Restraint of Orange, the trial court ordered closure by the following statement:

I am ruling no family members, no spectators will be permitted in this courtroom during the selection of the jury because of the limitation of space, security, etcetera [sic]. That's my ruling.[[19]]
The supreme court examined the "plain language of its ruling" in order to determine that the trial court had effectuated a permanent, full closure of the courtroom that day, thus requiring an analysis of the Bone-Club factors.[20]
¶ 28 In State v. Brightman, the trial court told the attorneys in a pre-trial proceeding to:
tell the friends, relatives, and acquaintances of the victim and the defendant that the first two or three days for selecting the jury the courtroom is packed with jurors, they can't observe that.[[21]]
Although the supreme court did not inquire whether this order had actually been enforced, it emphasized that the court in Orange looked "solely to the transcript of the trial court's ruling" to determine whether the order constituted a closure.[22] The court went on to hold:

[O]nce the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed.[[23]]
¶ 29 In this case, the trial court simply never ordered that the proceeding be closed to any spectators or family members. Looking to the plain language of the transcript, as these cases require us to do, it is apparent that no statement or order by the trial court triggered application of the Bone-Club factors or shifted the burden to the State to prove that the proceeding was open. Rather, the trial court and both parties' counsel recognized the space constraints and the need to question jurors individually. The court concluded that the only way to accommodate these concerns was to leave the jury venire in the courtroom and conduct individual juror questioning in the only other available room  chambers  that was available during the morning session. Similar analysis applies to the court's use of the jury room during the afternoon session in Room West 813 of the King County Courthouse. Nothing in the trial court's language or actions indicates that any member of the public, aside from the other members of the jury venire, were excluded from this proceeding.
¶ 30 The other cases on which Dr. Momah relies are also distinguishable for the same reasons. For example, in NBC Subsidiary (KNBC-TV), Inc. v. Los Angeles County Superior Court, "the public and the press were ushered out of the courtroom" in response to one of the trial court's closure orders.[24]
*1069 ¶ 31 Relying on the NBC case, Dr. Momah argues that all proceedings conducted in chambers are per se closed to the public. But the court in that case actually concluded that "although in some situations it may be appropriate to exclude the public and the press from chambers proceedings," those proceedings are still part of the trial process, subject to the same rules for closure.[25]
¶ 32 The dictionary definitions and other cases Dr. Momah cites likewise do not establish that a proceeding is automatically closed to the public if it occurs in chambers. They are mere observations that proceedings in chambers are often closed to the public. Moreover, we conclude that the trial court's statement in this case, "We have moved into chambers here. The door is closed," was also nothing more than an observation. Of course, a "door" to a courtroom being closed, which occurs in most court proceedings, is not the same as a "proceeding" in that courtroom being closed to the public.
¶ 33 Dr. Momah also relies on a recent case from Division Three, State v. Frawley.[26] We decline to follow that case.
¶ 34 There, the court reversed Frawley's conviction and remanded for a new trial based on the fact that one day of voir dire was conducted in chambers, outside Frawley's presence. It is unclear from the facts of that case whether any member of the public or press was actually prevented from watching the proceedings, but it appears from the opinion that the parties were concerned about questioning jurors while other members of the public were present.[27]
¶ 35 In contrast, Dr. Momah was present both in chambers and in the jury room for the October 11 day of voir dire. Another distinction is that the trial court and the parties here were concerned with questioning potential jurors out of the presence of the rest of the jury venire, not the public or press. Their failure to mention the public or press implies that they did not intend on excluding either from observing voir dire.
¶ 36 To the extent that Frawley holds that all in-chambers proceedings are per se closed to the public, we decline to follow Division Three's reasoning in that case.
¶ 37 To summarize, Dr. Momah has failed to carry his burden to show that the trial court closed his trial, depriving him of his constitutional right to a public trial. Accordingly, we do not reach whether any closure was justified under the standards stated in Bone-Club and subsequent cases.
¶ 38 We affirm the judgment and sentence.
¶ 39 The remaining issues of this opinion are not of precedential importance. Accordingly, the remainder of this opinion is not published.[28]
WE CONCUR: APPELWICK, C.J., and GROSSE, J.
NOTES
[1] In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004).
[2] Id. at 805-07 100 P.3d 291 (quoting State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325 (1995)).
[3] Id. at 806, 100 P.3d 291 (citing Waller v. Georgia, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); Press-Enter. Co. v. Superior Court of Cal., 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).
[4] Id.
[5] Id. (citing Waller, 467 U.S. at 45-47, 104 S.Ct. 2210).
[6] Orange, 152 Wash.2d at 808, 100 P.3d 291; Bone-Club, 128 Wash.2d at 261, 906 P.2d 325; State v. Brightman, 155 Wash.2d 506, 516, 122 P.3d 150 (2005); see also Orange, 152 Wash.2d at 823, 100 P.3d 291 (Madsen, J., concurring) ("[I]n order to determine whether a trial closure violates the constitutional standard applicable to the open trial guaranty, a reviewing court must consider . . . the language of the closure ruling. . . ."); United States v. Shryock, 342 F.3d 948, 974 (9th Cir.2003) ("The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom.") (quoting United States v. Al-Smadi, 15 F.3d 153, 155 (10th Cir.1994)).
[7] Orange, 152 Wash.2d at 814, 100 P.3d 291 (quoting Bone-Club, 128 Wash.2d at 261-62, 906 P.2d 325 and citing State v. Marsh, 126 Wash. 142, 146-47, 217 P. 705 (1923); Waller, 467 U.S. at 49 & n. 9, 104 S.Ct. 2210).
[8] See State v. Gregory, 158 Wash.2d 759, 816, 147 P.3d 1201 (2006).
[9] See id.
[10] See, e.g., Shryock, 342 F.3d at 974, cited in Brightman, 155 Wash.2d at 517, 122 P.3d 150.
[11] Appellant's Opening Brief at 26-27.
[12] Report of Proceedings (Oct. 11, 2005) at 2.
[13] Id.
[14] Report of Proceedings (Oct. 11, 2005) at 2, 4.
[15] Id. at 19-20.
[16] Id. at 105.
[17] 128 Wash.2d 254, 256, 906 P.2d 325 (1995).
[18] Id. at 261, 906 P.2d 325 (emphasis added).
[19] 152 Wash.2d 795, 802, 100 P.3d 291 (2004) (emphasis and editorial comment in original).
[20] Id. at 808, 100 P.3d 291 (emphasis added).
[21] 155 Wash.2d 506, 511, 122 P.3d 150 (2005).
[22] Id. at 516, 122 P.3d 150 (emphasis in original).
[23] Id. (emphasis added).
[24] 20 Cal.4th 1178, 1186, 86 Cal.Rptr.2d 778, 980 P.2d 337 (1999).
[25] Id. at 1215, 86 Cal.Rptr.2d 778, 980 P.2d 337.
[26] 140 Wash.App. 713, 167 P.3d 593 (2007).
[27] See id. at 599 (Brown, J., dissenting) (noting that Frawley's agreement with the chambers questioning was based on his preference that potential jurors be questioned outside the presence of the public).
[28] See RCW 2.06.040.