[No. 63814-9-I.   Division One.   October 12, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. DONNELL WAYNE PRICE, *Appellant*.

482

*Donnell Wayne Price*, pro se.

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Kathleen Proctor* and *Thomas Charles Roberts, Deputies*, for respondent.

¶1 GROSSE, J. — The right to a public trial is implicated only when the court orders a courtroom closed to the public. Here, the trial court conducted individual voir dire of a potential juror in the courtroom apart from the other potential jurors and a spectator who left the courtroom at the prosecutor's request. Because the other potential jurors were officers of the court, not members of the public, and the spectator was not ordered by the court to leave, there was no court-ordered courtroom closure. Thus, Donnell Price fails to show a violation of his right to a public trial. We affirm.

## FACTS

¶2 On September 3, 2006, Olga Carter called 911 to report a domestic violence incident involving her boyfriend, Donnell Price. Carter told the 911 operator that Price had a gun. Police responded and arrived at Price's home in Tacoma.

¶3 When the officers approached the house, they heard a man and woman arguing inside and then heard the man

say something about flashing lights outside. They then saw Price come to the door and step outside. An officer shined his flashlight on him and announced "Tacoma Police," but Price went back inside and slammed the door shut.

¶4 A few seconds later, the police heard a woman scream. Officers quickly approached the front and back doors and demanded that the occupants come out. When there was no response, they kicked in the front door and then heard a gunshot. The officers then continued to announce their presence and to call on the occupants to come out of the house, but there was no response. Price eventually came out through the front door after repeated police demands.

¶5 Police then entered the house and found Carter dead on the floor in the utility room. On a nearby table, police also found a handwritten note that contained Carter's fingerprints, was in her handwriting, and was on paper torn from a notebook in her purse. The note read:

To AuBriana
From: Olga Mommy
Mommy Luv
Mr. Price
Shot Me
Dead
He thought
I Fooled Around
A Gun
to my
Head.

Carter had a daughter named AuBriana.

¶6 An autopsy confirmed that Carter died of a single gunshot wound. The fatal wound was a contact gunshot wound to her neck. Forensic evidence indicated that the gun had been placed against her neck pointed upward and that the bullet travelled through her throat, cervical vertebrae, spinal cord, and brain. Forensic evidence also showed

that Price had gunpowder burns on his shirt and chest, indicating that he was holding Carter very close to him when the shot was fired.

¶7 The State charged Price with one count of first degree murder and one count of unlawful possession of a firearm. The information also included a firearm enhancement allegation and alleged aggravating factors of deliberate cruelty and intimidation of the victim.

¶8 During voir dire, one of the jurors requested to discuss an issue in private and the court indicated that it would address it at the end of the day. After voir dire was finished for the day, the court excused the rest of panel so that juror could be questioned alone in the courtroom. Also present in the courtroom at the time was the murder victim's mother, who agreed to step outside of the courtroom at the prosecutor's request. The juror was then questioned in court on the record.

¶9 During pretrial motions, the State moved in limine to admit the note found at the murder scene as a dying declaration. Over Price's objection, the trial court ruled that the note was admissible.

¶10 The jury found Price guilty as charged. The jury also found by special verdict that he was armed with a firearm and that the crime was committed to intimidate the victim. The court sentenced him to a total of 494 months' confinement, which included a 60-month firearm enhancement and an exceptional sentence of 60 months based on the aggravating factor of intimidating the victim.

## ANALYSIS

### I. *Right to a Public Trial*

¶11 Price first contends that the trial court violated his right to a public trial by questioning a juror privately without first determining whether a courtroom closure was justified and engaging in the inquiry required by *State v.*

*Bone-Club*.[1] The State contends that there was no court-room closure triggering the need for the *Bone-Club* inquiry. We agree.

¶12 Whether a defendant's right to a public trial has been violated is a question of law, reviewed de novo on appeal.[2] A criminal defendant has a right to a public trial under the state and federal constitutions.[3] The right to a public trial applies during jury voir dire.[4]

¶13 In *Bone-Club*, the court set forth the following factors that a trial court must consider on the record before ordering a courtroom closure:

"1. The proponent of closure or sealing must make some showing [of a compelling state interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."[5]

Failure to conduct the *Bone-Club* inquiry results in reversal for a new trial.[6]

¶14 Recent decisions from the divisions of this court have reached different conclusions about what consti-

---

[1] 128 Wn.2d 254, 906 P.2d 325 (1995).

[2] *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

[3] WASH. CONST. art. I, § 22; U.S. CONST. amend. VI; *Brightman*, 155 Wn.2d at 514.

[4] *Gannett Co. v. DePasquale*, 443 U.S. 368, 379, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979); *Fed. Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 59-60, 615 P.2d 440 (1980).

[5] *Bone-Club*, 128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

[6] *Brightman*, 155 Wn.2d at 518.

tutes a courtroom "closure" triggering the need for a *Bone-Club* inquiry. In *State v. Momah*, Division One held that conducting voir dire outside the courtroom does not amount to a courtroom closure if there is no explicit closure order.[7] In *State v. Wise*, a panel of Division Two followed the reasoning in *Momah* and held that private questioning of a juror in chambers did not constitute a courtroom closure.[8] But other panels of Division Two and Division Three have held that conducting voir dire of one member of the venire privately outside of the courtroom (e.g., in chambers or the jury room) constitutes a courtroom closure for purposes of *Bone-Club*, even in the absence of an explicit court order.[9] Here, the individual voir dire was conducted in the courtroom, not in another area that was closed off from the rest of the courtroom and the public.[10] This is precisely what the court in *State v. Erickson* described as the "better practice" for conducting individual voir dire.[11] Nor does questioning of individual jurors apart from other jurors violate the right to a public trial because once the jurors are sworn in, they are no longer members of the public, but officers of the court.[12] Thus, there was no courtroom closure when the trial court conducted individual voir dire of one juror in the courtroom apart from the other jurors.

---

[7] 141 Wn. App. 705, 171 P.3d 1064 (2007), *review granted*, 163 Wn.2d 1012 (2008).

[8] 148 Wn. App. 425, 436, 200 P.3d 266 (2009).

[9] *State v. Heath*, 150 Wn. App. 121, 206 P.3d 712 (2009) (Div. II); *State v. Erickson*, 146 Wn. App. 200, 189 P.3d 245 (2008) (Div. II); *State v. Duckett*, 141 Wn. App. 797, 173 P.3d 948 (2007) (Div. III); *State v. Frawley*, 140 Wn. App. 713, 167 P.3d 593 (2007) (Div. III).

[10] The record does not reflect that the courtroom door was closed or locked and during an earlier questioning of an individual juror, the court stated on the record that it was doing so "in open court with just the attorneys and the defendant and security and the staff here."

[11] 146 Wn. App. 200, 211 n.8, 189 P.3d 245 (2008) (noting that the "better practice" is inside the courtroom, outside the jurors' presence).

[12] *State v. Vega*, 144 Wn. App. 914, 917, 184 P.3d 677 (2008); *see also Erickson*, 146 Wn. App. at 205 n.2 (agreeing that questioning an individual juror apart from other prospective jurors in open court is not a court closure and secures the right to a public trial).

■ ¶15 The question that remains is whether a court-room closure occurred when the one spectator present in the courtroom was asked to leave during the individual voir dire. To determine whether a closure occurred, the court looks to the plain language of the closure request.[13] Here, the record indicates that the court did not ask the spectator to leave; rather, she left at the prosecutor's request when the judicial assistant asked who she was and whether she would be testifying:

> THE COURT: . . . We will continue with the questioning as requested by 31, and that will be the last thing we do this evening. Everybody else is excused until tomorrow morning at 9:30. Leave your numbers on your bench.
>
> JUDICIAL ASSISTANT: Mr. Hammond [prosecutor], the party that's been sitting in, do you know who that is?
>
> MR. HAMMOND: Mother of the victim.
>
> JUDICIAL ASSISTANT: And she is not going to be testifying?
>
> MR. HAMMOND: No, she won't be.
>
> THE COURT: I'm going to ask --
>
> MR. HAMMOND: Do you mind stepping out for this part?
>
> UNIDENTIFIED FEMALE: Yes. Could I ask a question of the Court? Start here tomorrow at 9:30, or just at 1:30?
>
> THE COURT: 9:30. But the jury is going to form or the venire is going to form downstairs at 9:30 and then, when we are through here, then we will call up the venire when we are ready for them in the morning. They are going to come in at 9:30 to the first floor.
>
> UNIDENTIFIED FEMALE: Okay. And then the resumption of the pretrial is at 1:30?
>
> THE COURT: No, no. We will start the voir dire about 9:30.
>
> UNIDENTIFIED FEMALE: Okay. So it will be all day?
>
> MR. HAMMOND: Yes, all day.
>
> UNIDENTIFIED FEMALE: Thank you very much.
>
> THE COURT: Thank you.

---

[13] *Bone-Club*, 128 Wn.2d at 261.

The prosecutor's request that the spectator leave the court-room does not amount to a courtroom closure because there was no court order, implied or otherwise: the prosecutor—not the court—requested that the spectator leave and it was a request—not an order—to which the spectator agreed.

¶16 Because there was no courtroom closure here, Price's right to a public trial was not implicated. Thus, we need not reach the State's additional arguments that he waived or lacked standing to assert that right.

## II. *Dying Declaration*

¶17 Price next contends that the trial court erred by admitting Carter's note because the State failed to lay sufficient foundation to admit it as a dying declaration and it was testimonial evidence that violated his right to confrontation. We disagree.

¶18 Evidentiary errors are reviewed for an abuse of discretion.[14] ER 804(b) provides an exception to the hearsay rule for dying declarations:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (2) *Statement Under Belief of Impending Death.* In a trial for homicide or in a civil action proceeding, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be the declarant's impending death.

¶19 Price contends that the State failed to lay the proper foundation for admitting the note as a dying declaration because it was impossible to determine if the note was written at a time when Carter reasonably believed she might die. But as he acknowledges, the note was dated either "9/2" or "9/3" and the murder occurred in the early morning of September 3. The evidence also showed it was written on paper torn from a notepad in her purse that was

---

[14] *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999).

found near her body at the scene. Price's argument that the evidence lacks "certainty" that this was when the note was written is an argument that goes to the weight, rather than the admissibility, of the evidence.

¶20 The evidence shows that Carter was confronted by Price with a gun during a domestic violence dispute and he was angered even more by the police's arrival. This, together with evidence indicating that the note was written shortly before the shooting, is sufficient to establish that Carter wrote the note at a time when she reasonably believed her death was imminent.

¶21 Price further contends that "there is a strong inference" that Carter's statement was erroneous because he did not shoot her for "fooling around" as the note indicates, but because she had contacted the police during their argument. But again, this is an argument that goes to the weight, not admissibility, of the evidence. The other inference to be drawn is that he shot her for the reason the note stated: he already had the gun and confronted her with it even before she called 911 or the police arrived. The trial court did not abuse its discretion by ruling that the note was admissible as a dying declaration.

¶22 Price further contends that the confrontation clause prevents admission of the note because it was testimonial and he did not have a prior opportunity to cross-examine her. We disagree.

¶23 Admitting hearsay evidence when the declarant is unavailable to testify raises confrontation clause concerns.[15] Thus, even if a hearsay exception applies, the confrontation clause requires the trial court to also determine whether the hearsay evidence is " 'testimonial.' "[16] If it is testimonial, the court may admit the hearsay evidence

---

[15] *State v. Kirkpatrick*, 160 Wn.2d 873, 881, 161 P.3d 990 (2007).

[16] *Kirkpatrick*, 160 Wn.2d at 882 (quoting *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

only if the defendant had a prior opportunity to cross-examine the declarant.[17]

¶24 The Supreme Court has not provided a comprehensive definition of "testimonial" evidence.[18] But the Court explained that testimonial statements are those that are "formal statement[s] to government officers" or produced with the involvement of government officers "with an eye toward trial."[19] Thus, testimonial statements are those " 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "[20]

¶25 Here, the statement was not made with police involvement, nor does its content suggest it was made "with an eye toward trial." Identifying the killer to assist police in the prosecution did not appear to be the purpose of the note, as Price suggests. Given the circumstances, Price's identity was not in question: Carter identified him to the 911 dispatcher, he was the only one at the house, and police observed him there. Rather, the content of the note conveys an intimate communication, intended as parting words to a family member. It was addressed affectionately to Carter's daughter (as opposed to the authorities or "to whom it may concern"), and was written in verse, rather than as an accusation or bearing witness to a crime for the prosecution. Thus, the note was not testimonial and its admission does not raise confrontation concerns.

¶26 Finally, Price contends that the trial court erred by also ruling that Carter's note was admissible under the doctrine of forfeiture by wrongdoing. Price argues that this ruling was error because the court did not make a finding that Price acted with intent to make Carter unavailable to testify at trial. The doctrine of forfeiture by wrongdoing

---

[17] *Kirkpatrick*, 160 Wn.2d at 882.

[18] *Crawford*, 541 U.S. at 68.

[19] *Crawford*, 541 U.S. at 51, 56 n.7.

[20] *Crawford*, 541 U.S. at 52 (quoting Br. of Amicus Curiae Nat'l Ass'n of Criminal Defense Lawyers).

permits a court to admit evidence that would otherwise be inadmissible under the confrontation clause when the defendant acted with intent to make to make the witness unavailable to testify at trial.[21] Because there was no confrontation violation here, applicability of the doctrine is irrelevant and the trial court did not need to reach this issue.[22]

¶27 Affirmed.

APPELWICK and LEACH, JJ., concur.

Review denied at 169 Wn.2d 1021 (2010).

---

[21] *Giles v. California*, 554 U.S. 353, 364-68, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

[22] In any event, the State concedes that the trial court's findings were insufficient to support application of the doctrine.