[No. 63869-6-I. Division One. May 2, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH NJUGUNA NJONGE, *Appellant*.

570

*Casey Grannis* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Donna L. Wise, Deputy*, for respondent.

¶1 APPELWICK, J. — Njonge appeals his conviction for second degree murder, contending that he was denied his right to a public trial when the trial court closed the courtroom during a portion of voir dire. We agree and reverse.

## FACTS

¶2 The State charged Joseph Njonge with premeditated first degree murder. Before trial began, the parties discussed several pretrial motions. The State made a motion to

exclude witnesses from voir dire. The following exchange occurred:

> [DEPUTY PROSECUTOR]: . . . Five of the family members of the victim are testifying at trial. They will be testifying as my first witnesses, and I have told them that they are not allowed to be in the courtroom until after. At that point, I expect them to sit in.
>
> One of the family members had asked if they could sit in during voir dire. I have not had that request before; so I don't know the Court's feelings. It's not testimony. I don't think it's a concern, but I don't know, or even if there is space for that. So, I just wanted to raise that issue, also, to find out if that was even a possibility.
>
> THE COURT: It's not testimony; that's true. However, I'm not going to allow it. For one thing, we are in very cramped quarters for jury selection, and I think about the only place for visitors to sit is going to be in a little anteroom out there, and I will tell you, with what we are going to do about trying to get enough just to do this in one meeting.
>
> The other thing is, quite frankly, the jurors will be seeing that face throughout the entire process and maybe making some connections with that person when the person gets on the stand. I don't think it's fair; so, I am not going to allow it.

The defense did not object. The court later described how voir dire would be conducted:

> So then we call the entire jury panel up. We have received permission to get more than the standard 50. I think we are getting 65. That necessitates a rearrangement of our courtroom, and my Bailiff put out a map for you guys as to how we are going to get this number in. The first two benches must remain clear at all times.

The defense did not object. Shortly after, the court addressed observers:

> Just let me say for the people who are observing. You are certainly welcome to observe. Tomorrow when we have the jury selection, there will not be room for all of you. What we are going to do to allow people to observe is check with the fire

marshall [sic] . . . and make sure that we can keep those first swinging doors open. And if we can do that, then we will allow some people to observe if they wish to do so during jury selection by sitting in that kind of entry hall, if we can do that.

But, otherwise, as you can see, we are already putting chairs up here to accommodate the jury. We may be able to have chairs out there; we may not. We may be able to have the doors open without chairs. We are going to find that out. The chance of all [of] you being able to be here and observe are slim to none during the jury selection process.

The defense did not object.

¶3 The next morning, the parties did not discuss accommodation of the public in the courtroom. Jury selection began. Several jurors were excused from service based on hardship. After the noon break, the prosecutor stated:

Some family members who are not witnesses stuck around this morning, hoping there might be some seats later, and your bailiff informed them at lunch since some people were excused there were some. So I don't know if the Court has any problem with that. They are not witnesses. We tried to figure out a spot that would be in a row that basically has no jurors. So that second row over there only has Juror 30. Is that okay with the Court if they are in there?

The judge responded:

Actually, that seemed to be a better idea. We checked with the fire department. They wouldn't let us leave the doors open for visitors to come in. Let's move No. 30 over next to 34, and then we can have visitors sitting in the second row there.

There was no additional discussion of the issue on the record. The record does not show any observer being asked to leave the courtroom or any objection to the voir dire procedure by either the parties or any observers. The court clerk's minutes reflect no order relating to a closure.

¶4 The jury found Njonge guilty of the lesser included offense of second degree murder. Njonge appeals.

## DISCUSSION

¶5 Njonge contends the trial court violated his constitutional right to a public trial by closing the courtroom to the public during voir dire. Whether a defendant's constitutional right to a public trial has been violated is a question of law that this court reviews de novo. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

¶6 A defendant's right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Strode*, 167 Wn.2d 222, 225, 217 P.3d 310 (2009). These provisions ensure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny. *Brightman*, 155 Wn.2d at 514. While the right to a public trial is not absolute, it is strictly guarded to assure that proceedings occur outside the public courtroom in only the most unusual circumstances. *Strode*, 167 Wn.2d at 226. Also, the public has a right to open administration of justice under article I, section 10 of the Washington State Constitution and the First and Fourteenth Amendments to the United States Constitution. *Id.* at 225-26; *Presley v. Georgia*, ___ U.S. ___, 130 S. Ct. 721, 723, 175 L. Ed. 2d 675 (2010).

¶7 To protect the defendant's right to a public trial, our Supreme Court held in *State v. Bone-Club* that a trial court must analyze and weigh five factors before closing a portion of a criminal trial.[1] 128 Wn.2d 254, 258-59, 906 P.2d

---

[1] Under *Bone-Club*:

"1. The proponent of closure . . . must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

325 (1995). Also, the court must enter specific findings justifying its closure order. *State v. Easterling*, 157 Wn.2d 167, 175, 137 P.3d 825 (2006) (citing *Bone-Club*, 128 Wn.2d at 258-59). These requirements extend to closure of jury selection. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)); *see also Presley*, 130 S. Ct. at 724.[2] Generally, if the record indicates a violation of a defendant's public trial right, our courts presume prejudice, reverse the conviction, and remand for a new trial. *Easterling*, 157 Wn.2d at 174, 181. The trial court did not analyze the *Bone-Club* factors on the record here.

¶8 The State first contends that the record does not reflect an actual closure, so Njonge may not raise this issue for the first time on appeal because the error is not "manifest" under RAP 2.5.[3] The State also contends that because the court did not expressly order closure, the *Bone-Club* requirements were not triggered. The State contends, "In every courtroom closure case decided in Washington, the appellate court has reversed only upon a showing that the trial court actually issued an order closing the courtroom, or where it was clear that people were in fact excluded from the proceedings."

¶9 It is well settled that a criminal defendant may raise the article I, section 22 right to a public trial for the first time on appeal. *Strode*, 167 Wn.2d at 231; *Easterling*,

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

128 Wn.2d 254, 258-59, 906 P.2d 325 (1995) (second alteration in original) (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)); *see also Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36-39, 640 P.2d 716 (1982) (setting forth five-part analysis under article I, section 10).

[2] Njonge contends that *Presley* controls the outcome here. In that case, the United States Supreme Court held that closing voir dire without considering alternatives and making specific findings violates the Sixth Amendment right to public trial. *Presley*, 130 S. Ct. at 724. But, in that case there was a clear ruling by the trial court excluding the lone observer, to which Presley objected. *Id.* at 722. *Presley* does not inform the question of whether closure occurred.

[3] RAP 2.5(a)(3) allows a party to raise a manifest constitutional error for the first time on appeal.

157 Wn.2d at 173 n.2; *Orange*, 152 Wn.2d at 814; *State v. Duckett*, 141 Wn. App. 797, 805-06, 173 P.3d 948 (2007).[4] Several of the cases previously so holding involved express closure orders. *See Easterling*, 157 Wn.2d at 172 (trial court ordered courtroom closed during discussion of Easterling's motion to dismiss); *Orange*, 152 Wn.2d at 802 (trial court ordered that no spectators would be permitted during the selection of the jury due to space limitations and security concerns). But, several Washington courts have held that a courtroom closure can occur even in the absence of an explicit court order. *See Strode*, 167 Wn.2d at 227 ("The trial judge's decision to allow this questioning of prospective jurors in chambers was a courtroom closure and a denial of the right to a public trial."); *State v. Heath*, 150 Wn. App. 121, 125, 206 P.3d 712 (2009) (portions of pretrial hearings and voir dire in chambers occurred without express order and without objection); *State v. Erickson*, 146 Wn. App. 200, 203, 189 P.3d 245 (2008) (trial court performed individual questioning of jurors outside the presence of the public without express order and without objection); *Duckett*, 141 Wn. App. at 801 (the trial court notified both counsel that it generally performed individual questioning of jurors in the jury room and would use that procedure, without objection); *State v. Frawley*, 140 Wn. App. 713, 718, 720, 167 P.3d 593 (2007) (individual juror questioning in closed courtroom occurred without express order and without objection). *But see State v. Price*, 154 Wn. App. 480, 488-89, 228 P.3d 1276 (2009) (holding that no courtroom closure occurred when prosecutor, not court, asked sole observer to leave the courtroom during individual questioning of juror), *review denied*, 169 Wn.2d 1021, 238 P.3d 504 (2010). The case law

---

[4] *But see State v. Wise*, 148 Wn. App. 425, 436, 200 P.3d 266 (2009) ("temporary and partial" closure of voir dire must be preserved by objection for appellate review); *State v. Paumier*, 155 Wn. App. 673, 688, 230 P.3d 212 (Quinn-Brintnall, J., dissenting) (asserting that the majority should have declined to review the public trial issue due to the defendant's failure to timely object and preserve the error), *review granted*, 169 Wn.2d 1017, 236 P.3d 206 (2010); *but see also Levine v. United States*, 362 U.S. 610, 619, 80 S. Ct. 1038, 4 L. Ed. 2d 989 (1960) (stating that failure to object to closing of courtroom waived right to public trial).

does not prevent a challenge absent an express closure order.

¶10 The State next argues that Njonge was required to object to any limitation on the number of spectators in order to obtain review under the rule in *State v. Collins*, 50 Wn.2d 740, 314 P.2d 660 (1957). We disagree. In *Collins*, the trial court agreed to lock the courtroom doors during the prosecutor's closing argument to prevent observers from moving in and out, but permitted those observers already in the courtroom to remain. *Id.* at 745-46. The Supreme Court held that because Collins received a public trial, the admittance of additional members of the public fell within the trial court's discretion to manage the courtroom. *Id.* at 748; *see also State v. Gregory*, 158 Wn.2d 759, 816, 147 P.3d 1201 (2006) (a trial court has the inherent authority and broad discretion to regulate the conduct of a trial). Collins's failure to object to "the discretionary ruling" did not preserve any error for review. *Collins*, 50 Wn.2d at 748. But, the court explicitly stated in *Collins* that it is unnecessary for a defendant to object to preserve review of a clear violation of the right to a public trial. *Id.* at 747-48.

¶11 Finally, in *State v. Momah*, this court reasoned that because the record did not show either an express closure order or the actual exclusion of any member of the public and Momah did not object, Momah failed to carry his burden to demonstrate that a constitutional violation occurred when a portion of jury selection was held in chambers. 141 Wn. App. 705, 712, 171 P.3d 1064 (2007), *aff'd*, 167 Wn.2d 140, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010). The Supreme Court evidently rejected that rationale without a discussion of whether closure occurred. *Momah*, 167 Wn.2d at 156 ("We hold the closure in this case was not a structural error."). We hold that Njonge is not required to show an express closure order or to make an objection in order to obtain review on his public trial argument raised for the first time on appeal.

¶12 Next, we consider whether a closure occurred here. The major Washington case relating to closure due to space

limitations is *Orange.* In that case, Orange filed a personal restraint petition alleging ineffective assistance of counsel resulting from counsel's failure to object to the trial court's closure of the courtroom during voir dire. 152 Wn.2d at 800. The trial court called a 98 member jury venire. *Id.* at 810. The trial court then ruled, without considering the *Bone-Club* factors, that no spectators would be permitted in the courtroom during the selection of the jury " 'because of the limitation of space, security, etcetera [sic].' " *Id.* at 802 (alteration in original). This ruling constituted a full, permanent exclusion, although some observers may have been permitted to enter at some point during voir dire. *Id.* at 809. The Supreme Court evaluated the *Bone-Club* factors and determined that the reasons given by the trial court for the closure, space limitations and security, were not sufficiently compelling to warrant intrusion on Orange's right to a public trial. *Id.* at 809-12. It additionally concluded that the failure to consider all of the *Bone-Club* factors warranted reversal. *Id.* at 814; *see also Presley*, 130 S. Ct. at 722, 724-25 (exclusion of lone courtroom observer due to space limitations over defendant's objection violated Presley's right to a public trial under the Sixth Amendment).

¶13 *Brightman* also provides a useful comparison. In that case, the trial court told the attorneys in a pretrial proceeding:

> "In terms of observers and witnesses, we can't have any observers while we are selecting the jury, so if you would tell the friends, relatives, and acquaintances of the victim and defendant that the first two or three days for selecting the jury the courtroom is packed with jurors, they can't observe that. It causes a problem in terms of security."

*Brightman*, 155 Wn.2d at 511. Although the Supreme Court did not inquire whether this order had actually been enforced, it emphasized that the court in *Orange* looked *"solely to the transcript of the trial court's ruling"* to determine whether the order constituted a closure. *Id.* at 516. The court explained:

The State makes an argument similar to the one presented in [*State v.*] *Gaines*[, 144 Wash. 446, 258 P. 508 (1927)], asserting that the trial court's statement to the attorneys in this case did not amount to a ruling. However, the trial court made the relevant statement in the course of pretrial "housekeeping," in which the judge decided several matters. The trial court gave clear instructions to the attorneys, and there is nothing to indicate that either the judge or the attorneys believed that compliance with the trial judge's directive was optional. Therefore, the argument that the trial court's statement in this case did not amount to a ruling is unconvincing.

*Id.* at 516 n.7 (citations omitted).[5] The court went on to hold, "[O]nce the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed." *Id.* at 516.

 ¶14 Here, the trial court similarly made a clear statement to both the parties and observers during pretrial motions that they would not be permitted in the courtroom the next day. Although the court thought at the time that observers might have been able to watch from the anteroom, that did not ultimately occur. The combined effect of the trial court's statements and the closed courtroom doors resulted in a closure as to those observers who heard the trial court's statements on the first day. The record shows

---

[5] In *Gaines*, 144 Wash. at 462, the court announced, " 'Before adjourning, I will state that the atmosphere is pretty unbearable. I know the jury must also feel it. I assume there is a certain part of the members of the bar, who from the standpoint of students, desire to hear the testimony, but with those exceptions, court officers and members of the bar, the general public will be excluded, beginning tomorrow.' " Members of the public were at some point admitted to the room. *Id.* at 462. The court held that the normal presumption that an order to close was carried out applies only to formal orders. *Id.* at 463. But, because members of the public were in fact admitted, "[i]f the attendance was limited to the reasonable capacity of the courtroom, without partiality or favoritism, we do not understand that there is any claim that this would have constituted error." *Id.* at 463. But, *Gaines* has been superseded by subsequent cases. *See Orange*, 152 Wn.2d at 813 ("But *Gaines* was decided more than 50 years before the United States Supreme Court decided *Press-Enterprises* and *Waller*[ *v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984),] and more than 60 years before this court applied the constitutional guidelines to assess defendant Bone-Club's claimed violation of his right to a public trial."); *Brightman*, 155 Wn.2d at 516-17 ("However, as the *Orange* court reasoned, *Gaines* has since been superseded by *Waller* and *Bone-Club*.").

that this resulted in a full closure of voir dire for the morning session.[6]

¶15 Alternatives exist to closure in such cases, including calling fewer jurors, reserving certain rows for the public, dividing the jury venire panel, or moving to a larger courtroom. *See Presley*, 130 S. Ct. at 725; *Orange*, 152 Wn.2d at 809-10. If these are not available, courts might consider technological solutions, such as providing live video feed of the proceedings in another courtroom. Of course, the court always has the opportunity to seek a knowing, intelligent, and voluntary waiver of the right to a public trial by the defendant. *See Strode*, 167 Wn.2d at 229 n.3 ("[T]he right to a public trial can be waived only in a knowing, voluntary, and intelligent manner." (citing *City of Bellevue v. Acrey*, 103 Wn.2d 203, 207-08, 691 P.2d 957 (1984) (waiver of the jury trial right must be affirmative and unequivocal))). But, where space limitations completely exclude the public, the trial court must engage in an analysis of the *Bone-Club* factors to determine whether any resulting closure is warranted absent a knowing, voluntary, and intelligent waiver of the defendant's public trial right.

¶16 We acknowledge that legitimate reasons may exist to close voir dire to the public. *See Presley*, 130 S. Ct. at 725 (threats of improper communications with jurors or safety issues may warrant closure); *Orange*, 152 Wn.2d at 827-28 (Ireland, J., dissenting) (overcrowding and distractions caused by observing family members may be legitimate reasons for closing a courtroom). But, general concerns regarding space issues and security may not be enough to warrant such a closure: "If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course." *Presley*, 130 S. Ct. at 725; *see also Orange*, 152 Wn.2d at 800 ("[I]n this case,

---

[6] We recognize that the trial court here worked hard to accommodate the public, going so far as to ask the fire marshal if the doors to the courtroom could be left open for observers. The trial court was also attempting to be efficient and make good use of court resources, and we commend those efforts.

neither the size of the courtroom nor a general concern for security provided an adequate basis for compromising the fundamental tenet [that an accused is entitled to have his family and friends present].”). If a specific concern, given the facts of the case, rather than a general concern, necessitates closure, a trial court may weigh that concern in the manner employed in *Bone-Club*. There is no evidence of such a need on the record here.

¶17 Here, the trial court did not analyze the *Bone-Club* factors on the record. The trial court offered two reasons for closure: space limitations and preventing the jurors from "maybe making some connections with that person when the person gets on the stand." We note that the court required the first two benches of the courtroom to be left open without indicating why that space was not available to the public or putting on the record its reason for doing so. The trial court did not consider less restrictive alternatives or expressly consider the impact of the closure on Njonge's right to a public trial. Because the court excluded the public from a portion of jury selection without applying the *Bone-Club* test, we reverse Njonge's conviction and remand for a new trial.[7]

¶18 Because we reverse Njonge's conviction, we need not consider whether the public's right to a public trial under section 10 was also violated. Also, we need not consider Njonge's additional assignments of error.

¶19 We reverse.

LEACH, A.C.J., and ELLINGTON, J., concur.

---

[7] Citing *State v. Irby*, 170 Wn.2d 874, 246 P.3d 796 (2011), the State contended for the first time at oral argument that reversal is not required because the court was closed only during the handling of ministerial matters, including hardship challenges and legal matters. We decline to address this new argument.